Barry I. Levy, Esq.
Frank P. Tiscione, Esq.
Colleen A. O'Neil, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees*
*Insurance Company, GEICO Indemnity Company,*
*GEICO General Insurance Company, and*
*GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY, and GEICO
CASUALTY COMPANY,

|  | Docket No.: _____(      ) |
|---|---|

Plaintiffs,

-against-

**Plaintiffs Demand a Trial by Jury**

ROLANDO CHUMACEIRO, M.D., SMART CHOICE
MEDICAL, P.C.,  MARCELO QUIROGA, D.C.,
SOUTHERN BLVD CHIROPRACTIC, P.C., JOHN PAUL
BUCCI, D.C., BROWNSVILLE CHIROPRACTIC, P.C.,
AHRAM UM, L.Ac., HARMONIZED ACUPUNCTURE,
P.C., SACHIE KUROYAMA, L.Ac., SA QI
ACUPUNCTURE, P.C., KAZUKO NAKAMURA, L.Ac.,
K N ACUPUNCTURE, P.C., PETER KHAIM a/k/a/ PETER
KHAIMOV, A&P HOLDING GROUP CORP.,
ALEXANDER GULKAROV, LL CONSULTING GROUP,
INC. d/b/a BILLING 4 YOU, L.L.C., ROMAN ISRAILOV,
ALL NETWORK MARKETING CORP., ALEX
BUZIASHVILI, INNOVATIONS TECH GROUP, L.L.C.,
ANTHONY DIPIETRO, and JOHN DOE DEFENDANTS
"1-10",

Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**COMPLAINT**

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company (collectively, "GEICO" or "Plaintiffs"), as and for their Complaint against Defendants, hereby allege as follows:

**NATURE OF THE ACTION**

1.      This action seeks to recover more than $920,000.00 that Defendants wrongfully have obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise non-reimbursable healthcare services, including initial and follow-up examinations, diagnostic testing, acupuncture services, chiropractic services, pain management services, and physical therapy services (collectively, the "Fraudulent Services"), allegedly provided to New York automobile accident victims covered by policies of insurance issued by GEICO ("Insureds").

2.      The Fraudulent Services have been the product of a multi-pronged scheme perpetrated by Defendants against GEICO and other New York automobile insurers. First, unlicensed laypersons established two medical "clinics" and cultivated a patient base of Insureds that could be subjected to the Fraudulent Services. Second, the unlicensed laypersons "bought" the licenses of healthcare professionals in order to fraudulently control professional corporations and have them operate at the two medical "clinics." Third, the unlicensed laypersons used their illegal ownership of and control over the professional corporations and the patient base they cultivated to implement a fraudulent, predetermined treatment and billing protocol in order to enrich themselves by exploiting the Insureds' no-fault insurance benefits.

3.      As part of Defendants' fraudulent scheme, Defendants billed GEICO and other New York automobile insurers for a laundry-list of high frequency and unnecessary treatments

from the clinics, which were located at 1767 Southern Boulevard, Bronx, New York (the "Southern Blvd Medical Clinic") and 409 Rockaway Avenue, Brooklyn, New York 11212 (the "Rockaway Ave Medical Clinic"). In order to implement the scheme, Defendants used Smart Choice Medical, P.C. ("Smart Choice Medical"), as well as numerous acupuncture and chiropractic professional corporations, including but not limited to Defendants Brownsville Chiropractic, P.C. ("Brownsville Chiropractic"), Harmonized Acupuncture, P.C. ("Harmonized Acupuncture"), K N Acupuncture, P.C. ("K N Acupuncture"), Southern Blvd Chiropractic, P.C. ("Southern Blvd Chiropractic"), and Sa Qi Acupuncture, P.C. ("Sa Qi Acupuncture") (collectively the "Provider Defendants") as vehicles to bill for the Fraudulent Services.

4.     GEICO brings this action to recover the monies wrongfully obtained from it by Defendants and further seeks a declaration that it is not legally obligated to pay reimbursement of more than $2,500,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of the Provider Defendants, because:

(i)     the Provider Defendants were fraudulently incorporated, and/or unlawfully owned and controlled by unlicensed laypersons and, therefore, were ineligible to bill for or to collect no-fault benefits;

(ii)    the Fraudulent Services were not medically necessary and were provided pursuant to pre-determined fraudulent protocols established and implemented solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii)   the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and

(iv)    the Provider Defendants unlawfully split fees with unlicensed individuals and/or engaged in illegal kickback and/or referral arrangements and, therefore, were ineligible to bill for or to collect no-fault benefits.

5.     The Defendants fall into the following categories:

(i)     Smart Choice Medical, Brownsville Chiropractic, Southern Blvd Chiropractic, Harmonized Acupuncture, K N Acupuncture, and Sa Qi Acupuncture are medical, chiropractic, and/or acupuncture professional corporations through which the Fraudulent Services purportedly were performed and billed to New York automobile insurance companies, including GEICO.

(ii)    Rolando Chumaceiro, M.D. ("Chumaceiro"), Marcelo Quiroga, D.C. ("Quiroga"), John Paul Bucci, D.C. ("Bucci"), Ahram Um, L.Ac. ("Um"), Sachie Kuroyama, L.Ac. ("Kuroyama"), and Kazuko Nakamura, L.Ac. ("Nakamura") (collectively, the "Nominal Owner Defendants"), are licensed medical, chiropractic, and/or acupuncture professionals who falsely purported to own the Provider Defendants.

(iii)   Defendants Peter Khaim a/k/a Peter Khaimov ("Khaimov"), A&P Holding Group Corp. ("A&P Holding"), Alexander Gulkarov ("Gulkarov"), LL Consulting Group. Inc. d/b/a Billing 4 You, LLC ("Billing 4 You"), Roman Israilov ("Israilov"), All Network Marketing Corp. ("All Network Marketing"), Alex Buziashvili ("Buziashvili"), Innovations Tech Group, L.L.C. ("Innovations Tech"), Anthony DiPietro ("DiPietro"), and John Doe Defendants Nos. "1-10" (collectively the "Management Defendants") (a) illegally owned and controlled the Provider Defendants, the clinics from which the Provider Defendants operated, and the patient bases that were subjected to the Fraudulent Services, and (b) directed the Provider Defendants' illegal kickback scheme for patient referrals and predetermined treatment and billing protocols that were imposed without regard for genuine patient care.

6.      The Provider Defendants, though nominally owned on paper by the Nominal Owner Defendants, have been at all times secretly owned, operated, and controlled by the Management Defendants, and have served as vehicles through which fraudulent no-fault claims have been and continue to be submitted to GEICO and other New York automobile insurers.

7.      As discussed below, Defendants at all relevant times have known that: (i) the Provider Defendants were fraudulently incorporated, and/or unlawfully owned and controlled by unlicensed laypersons and, therefore, were ineligible to bill for or to collect No-Fault Benefits; (ii) the Fraudulent Services were not medically necessary and were provided pursuant to predetermined fraudulent protocols established and implemented solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iii) the billing codes used for the Fraudulent Services misrepresented and exaggerated

the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (iv) the Provider Defendants unlawfully split fees with unlicensed individuals and/or engaged in illegal kickback and referral arrangements and, therefore, were ineligible to bill for or to collect no-fault benefits.

8.      As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that have been billed to GEICO through the Provider Defendants.

9.      The charts annexed hereto as Exhibits "1-6" set forth the fraudulent claims that have been identified to-date that Defendants have submitted, or caused to be submitted, to GEICO.

10.     Defendants' fraudulent scheme perpetrated against GEICO and other New York automobile insurers began as early as 2016 and continues uninterrupted through present day. As a result of the Defendants' scheme, GEICO has incurred damages of more than $920,000.00.

## THE PARTIES

**I.      Plaintiffs**

11.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in New York and New Jersey.

II.         **Defendants**

        A.         **The Provider Defendants and Nominal Owner Defendants**

        12.         Defendant Smart Choice Medical is a New York medical professional corporation with its principal place of business in New York. Smart Choice Medical was incorporated on January 4, 2016 and was used by Defendants as a vehicle to submit fraudulent billing to GEICO.

        13.         Defendant Chumaceiro resides in and is a citizen of New York State. Chumaceiro was licensed to practice medicine in New York on February 3, 1993. From 2016 to present, Chumaceiro has served as the nominal or "paper" owner of Smart Choice Medical, and has purported to perform many of the Fraudulent Services on behalf of the professional corporation.

        14.         Defendant Southern Blvd Chiropractic is a New York chiropractic professional corporation with its principal place of business in New York. Southern Blvd Chiropractic was incorporated on January 7, 2016 and was used by Defendants as a vehicle to submit fraudulent billing to GEICO.

        15.         Defendant Quiroga resides in and is a citizen of New York State. Quiroga was licensed to practice chiropractic medicine in New York on January 3, 2013. From 2016 to present, Quiroga has served as the nominal or "paper" owner of Southern Blvd Chiropractic, and has purported to perform many of the Fraudulent Services on behalf of the professional corporation.

        16.         Defendant Brownsville Chiropractic is a New York professional corporation with its principal place of business in New York. Brownsville Chiropractic was incorporated on June 27, 2017 and was used by Defendants as a vehicle to submit fraudulent billing to GEICO.

        17.         Defendant Bucci resides in and is a citizen of New York State. Bucci was licensed to practice chiropractic medicine in New York on September 10, 1997. From 2017 to present,

Bucci has served as the nominal or "paper" owner of Brownsville Chiropractic, and has purported to perform many of the Fraudulent Services on behalf of the professional corporation.

18.     Defendant Sa Qi Acupuncture is a New York professional corporation with its principal place of business in New York. Sa Qi Acupuncture was incorporated on April 27, 2017 and was used by Defendants as a vehicle to submit fraudulent billing to GEICO.

19.     Defendant Kuroyama resides in and is a citizen of New York State. Kuroyama was licensed to practice acupuncture in New York on October 13, 2009. From 2017 to present, Kuroyama has served as the nominal or "paper" owner of Sa Qi Acupuncture, and has purported to perform many of the Fraudulent Services on behalf of the professional corporation.

20.     Defendant Harmonized Acupuncture is New York professional corporation with its principal place of business in New York. Harmonized Acupuncture was incorporated on March 21, 2018 and was used by Defendants as a vehicle to submit fraudulent billing to GEICO.

21.     Defendant Um resides in and is a citizen of New York State. Um was licensed to practice acupuncture in New York on April 23, 2008. From 2018 to present, Um has served as the nominal or "paper" owner of Harmonized Acupuncture, and has purported to perform many of the Fraudulent Services on behalf of the professional corporation.

22.     Defendant K N Acupuncture is a New York acupuncture professional corporation with its principal place of business in New York. K N Acupuncture was incorporated on July 24, 2017 and was used by Defendants as a vehicle to submit fraudulent billing to GEICO.

23.     Defendant Nakamura resides in and is a citizen of New York State. Nakamura was licensed to practice acupuncture in New York on August 4, 2010. From 2019 to present, Nakamura has served as the nominal or "paper" owner of K N Acupuncture and has purported to perform many of the Fraudulent Services on behalf of the professional corporation.

B.      **The Management Defendants**

24.     Defendant Gulkarov resides in and is a citizen of New York State. Gulkarov is a non-physician who at all times has secretly and unlawfully owned the Provider Defendants, along with the other Management Defendants, by virtue of the control he exercised over the Provider Defendants' operations and profits, as well as the treatment provided to Insureds at the Southern Blvd Medical Clinic and the Rockaway Ave Medical Clinic.

25.     Defendant Khaimov resides in and is a citizen of New York State. Khaimov is a non-physician who at all times has secretly and unlawfully owned the Provider Defendants, along with the other Management Defendants, by virtue of the control he exercised over the Provider Defendants' operations and profits, as well as the treatment provided to Insureds at the Southern Blvd Medical Clinic and the Rockaway Ave Medical Clinic.

26.     Defendant Israilov resides in and is a citizen of New York State. Israilov is a non-physician who at all times has secretly and unlawfully owned the Provider Defendants, along with the other Management Defendants, by virtue of the control he exercised over the Provider Defendants' operations and profits, as well as the treatments provided to Insureds at the Southern Blvd Medical Clinic and the Rockaway Ave Medical Clinic.

27.     Defendant Buziashvili resides in and is a citizen of New York State. Buziashvili is a non-physician who at all times has secretly and unlawfully owned the Provider Defendants, along with the other Management Defendants, by virtue of the control he exercised over the Provider Defendants' operations and profits, as well as the treatment provided to Insureds at the Southern Blvd Medical Clinic and the Rockaway Ave Medical Clinic.

28.     Buziashvili has a long history of involvement in insurance fraud schemes. For example, in 2002, Buziashvili was criminally indicted as part of the Brooklyn DA's Office

"Operation Gateway" no-fault insurance fraud investigation. Similar to the allegations herein, the "Operation Gateway" investigation demonstrated that Buzashivali, through a management company that he owned, purchased the names and medical licenses of several physicians and used them illegally to establish various medical professional corporations through which Buziashvili and others submitted massive amounts of fraudulent no-fault insurance charges to New York insurance companies. As a result of "Operation Gateway", Buziashvili was charged with several crimes, including enterprise corruption, fraud, and falsifying business records. Ultimately, he pleaded guilty to charges of tax evasion and falsifying business records and agreed to pay a $750,000.00 fine.

29.     Defendant DiPietro resides in and is a citizen of New York State. DiPietro is a non-physician who at all times has secretly and unlawfully owned the Provider Defendants, along with the other Management Defendants, by virtue of the control he exercised over the Provider Defendants' operations and profits, as well as the treatment provided to Insureds at the Southern Blvd Medical Clinic and the Rockaway Ave Medical Clinic.

30.     Defendant Billing 4 You was incorporated in New York State on or about January 2, 2013, has its principal place of business in New York, and has been used by Gulkarov and the other Management Defendants to illegally own and control the Provider Defendants and to siphon revenues from the Provider Defendants to the Management Defendants.

31.     Defendant A&P Holding was incorporated in New York State on or about December 1, 2014, has its principal place of business in New York, and has been used by Khaimov and the other Management Defendants to illegally own and control the Provider Defendants and to siphon revenues from the Provider Defendants to the Management Defendants.

32.     Defendant All Network Marketing was incorporated in New York State on or about May 12, 2016, has its principal place of business in New York, and has been used by Israilov and the other Management Defendants to illegally own and control the Provider Defendants and to siphon revenues from the Provider Defendants to the Management Defendants.

33.     Defendant Innovations Tech was incorporated in New York State on or about March 23, 2018, has its principal place of business in New York, and has been used by Buziashvili and the other Management Defendants to illegally own and control the Provider Defendants and to siphon revenues from the Provider Defendants to the Management Defendants.

34.     Upon information and belief, John Doe Defendants "1 – 10" reside in and are citizens of New York State. John Doe Defendants "1 – 10" are individuals and entities, presently not identifiable, who are not and never have been licensed medical professionals, yet – together with the Management Defendants – have owned, controlled, and derived economic benefit from the Provider Defendants in contravention of New York law, and have derived economic benefits from the operation of the Provider Defendants in contravention of New York law.

## JURISDICTION AND VENUE

35.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

36.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act) because they arise under the laws of the United States.

37.    In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

38.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

**ALLEGATIONS COMMON TO ALL CLAIMS**

39.    GEICO underwrites automobile insurance in New York.

**I.     An Overview of the No-Fault Laws and Licensing Statutes**

40.    New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.)(collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

41.    No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

42.    An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company within forty-five days of the date of service and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3").

In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

43.     Pursuant to the No-Fault Laws, healthcare providers are not eligible to bill for or to collect No-Fault Benefits if they are unlawfully incorporated or fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

44.     For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York … .

45.     In New York, only a licensed healthcare professional may: (i) practice the pertinent healthcare profession; (ii) own and control a professional corporation authorized to operate a professional healthcare practice; (iii) employ and supervise other healthcare professionals; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from healthcare professional services. Unlicensed individuals may <u>not</u>: (i) practice the pertinent healthcare profession; (ii) own or control a professional corporation authorized to operate a professional healthcare practice; (iii) employ or supervise healthcare professionals; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services.

46.     New York law prohibits licensed healthcare providers from splitting fees, paying or accepting kickbacks, or profiting in exchange for patient referrals or the furnishing of professional services.  <u>See</u>, <u>e.g.</u>, New York Education Law §§ 6509-a; 6531.

47.     Pursuant to Education Law §6512, §6530 (11), and (18), aiding and abetting an unlicensed person to practice a profession, offering any fee or consideration to a third party for the

referral of a patient, and permitting any person not authorized to practice medicine to share in the fees for professional services is considered a crime and/or professional misconduct.

48.     Pursuant to Education Law § 6509-a, it is professional misconduct under certain circumstances for a licensee to "directly or indirectly" request, receive, or participate in the division, transference, assignment, rebate, splitting, or refunding of a fee.  In addition, pursuant to 8 N.Y.C.R.R. §29.1(b)(3), a licensee is precluded from "directly or indirectly" offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services.

49.     Pursuant to Education Law §6530(19), a licensee commits professional misconduct where he/she permits a non-licensed person to share in fees for professional services.

50.     Therefore, under the No-Fault Laws, a healthcare provider is not eligible to receive No-Fault Benefits if it is unlawfully incorporated, if it engages in unlawful fee-splitting with unlicensed non-professionals, or if it pays or receives unlawful kickbacks in exchange for patient referrals.

51.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

52.     Pursuant to the No-Fault Laws, only healthcare providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than

the patient or his/her healthcare provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or … upon assignment by the applicant ... shall pay benefits <u>directly</u> to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

53. Accordingly, for a healthcare provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to Insurance Law § 5102(a), it must be the <u>actual</u> provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

54. In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

55. When a healthcare services provider submits a claim for No-Fault Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

56. Pursuant to New York State Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to Liberty Mutual, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading,

information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     The Defendants' Fraudulent Scheme

57.     Beginning in or about 2016, Defendants masterminded and implemented a series of interrelated, complex fraudulent schemes pursuant to which the Provider Defendants – owned on paper by the Nominal Owner Defendants, but actually illegally owned and controlled by the Management Defendants – were used to bill GEICO and the New York automobile insurance industry for hundreds of thousands of dollars in No-Fault insurance benefits they were never entitled to receive.

### A.     The Fraudulent Ownership and Operation of the Provider Defendants

58.     At all relevant times herein, the Management Defendants controlled the Southern Blvd Medical Clinic and the Rockaway Ave Medical Clinic, and unlawfully owned and controlled the healthcare providers operating within the two clinics.

59.     Although the Nominal Owner Defendants are listed as the record owners of the Provider Defendants on the Certificates of Incorporation, the Nominal Owner Defendants abdicated control over the billing protocols, treatment protocols, and the profits that were generated through the Provider Defendants. In fact, the day-to-day operations, supervisory control, and true ownership of the Provider Defendants rested in the hands of the Management Defendants.

60.     The Nominal Owner Defendants never sought to establish or build their name recognition or the name recognition of the Provider Defendants under which they operated in order to draw in business and never made any legitimate effort to generate patients. The reason for this is simple, the Management Defendants, rather than the Nominal Owner Defendants,

created and have always controlled the patient bases at the Southern Blvd Medical Clinic and the Rockaway Ave Medical Clinic.

61.     The Nominal Owner Defendants had no genuine doctor-patient relationship with the Insureds that visited the Southern Blvd Medical Clinic and the Rockaway Ave Medical Clinic, as the patients were simply directed to subject themselves to treatment by whatever healthcare providers were on duty that day at the clinics, regardless of the actual healthcare needs of the patients themselves.

62.     In fact, once patients arrived at the Southern Blvd Medical Clinic and the Rockaway Ave Medical Clinic for treatment, the healthcare services that each patient received from the Provider Defendants was pre-determined. These predetermined treatment protocols were established by the Management Defendants and implemented by the Nominal Defendants in order to bill for voluminous, unnecessary, and excessive treatments that were provided (or purported to be provided) regardless of the actual healthcare needs of each individual Insured.

63.     Throughout the course of the Nominal Owner Defendants' relationship with the Management Defendants, all decision-making authority relating to the operation and management of the Provider Defendants was vested entirely with the Management Defendants.

64.     The Management Defendants' decision-making authority relating to the operation and management of the Provider Defendants included control over the treatment protocols, the hiring of individuals who allegedly performed the Fraudulent Services, the hiring of administrative employees, the control over how the services would be billed to insurers, including GEICO, and how the profits of the Provider Defendants were to be dispersed.

65.     The Nominal Owner Defendants and the Provider Defendants relied on the Management Defendants, as the Management Defendants themselves were the true beneficial

owners and controllers of the healthcare practices operated under the names of the Provider Defendants.

66.     In reality, the Nominal Owner Defendants were never anything more than de facto employees of the Management Defendants.

67.     To conceal their illegal financial relationships and true ownership and control of the Provider Defendants while simultaneously effectuating pervasive, total control over their operation and management, the Management Defendants arranged to have Di Pietro purport to act as "practice administrator" of the Southern Blvd Medical Clinic and the Rockaway Ave Medical Clinic.

68.     As part of the Management Defendants' control over the Southern Blvd Medical Clinic and the Rockaway Ave Medical Clinic, the Management Defendants had the Provider Defendants utilize Gulkarov's Billing 4 You for "billing" services. Billing 4 You received between $5,000 to $7,500 per Provider Defendant per month for performing these "billing" services.

69.     Furthermore, the Management Defendants had the Provider Defendants utilize Israilov's All Network Marketing for "marketing" services. All Network Marketing typically received $5,000 per Provider Defendant per month for these "marketing" services.

70.     In addition, Chumaceiro and Smart Choice Medical paid "rent" to Defendant Khaimov's A&P Holding.

71.     The Management Defendants also had Bucci and Brownsville Chiropractic pay $13,000 per month rent to Defendant Buziashvili's Innovations Tech for use of a device called Nervomatrix Soleve (the "Nervomatrix Device").

72.     A&P Holding, Billing 4 You, and All Network Marketing all operated from 62-43A Woodhaven Boulevard, Rego Park, New York. A&P Holding held the main lease at this location. In addition, many of the Nominal Owner Defendants routinely visited this location in order to meet with the Management Defendants.

73.     The Management Defendants, not the Nominal Owner Defendants, controlled the receipt of all insurance proceeds collected by the Provider Defendants. Although the Nominal Owner Defendants received insurance checks from GEICO, the Nominal Owner Defendants – without reviewing the checks, making an inventory of them, or determining how much was received – turned these checks over to the Management Defendants. In turn, the Management Defendants utilized a scanner to deposit the checks directly into bank accounts held nominally in the names of the Provider Defendants, thereby giving the Management Defendants access and control over their accounts. Billing 4 You provided a monthly boilerplate "invoice" to the Provider Defendants indicating only the $5,000/$7,500 due for their "services." Billing 4 You did not identify how much was deposited, an inventory of checks, or any other information indicating how much Billing 4 You allegedly deposited into the Provider Defendants' accounts each month.

74.     The Management Defendants dictated all of the financial arrangements with the Provider Defendants and concealed them through individual "sham" agreements and invoices with each of the Provider Defendants.

75.     The individual agreements and financial arrangements with the Provider Defendants were not reflective of fair market value or the actual value of the services provided, if any, and when totaled among all of the Provider Defendants, reflected a scheme to use each of the Provider Defendants as a vehicle to illegally profit from professional medical services,

unlawfully split fees, and funnel large sums of money to themselves in contravention of New York law.

### 1. The Fraudulent Ownership and Operation of Smart Choice Medical

76.     As an initial step in their fraudulent scheme, the Management Defendants commenced a search for a licensed medical professional who would be willing to sell the use of his or her medical license to the Management Defendants so that the Management Defendants could illegally operate and control a medical professional corporation for the purpose of submitting fraudulent no-fault billing to New York no-fault insurers.

77.     The Management Defendants first recruited Chumaceiro, who was willing to sell the use of his medical professional license to the Management Defendants, so that they could illegally own, operate, and submit fraudulent no-fault billing through Smart Choice Medical.

78.     Although Chumaceiro is listed as the owner of record of Smart Choice Medical on its certificate of incorporation, Chumaceiro simply implemented the established treatment protocols, and exercised no ownership or control over the profits generated from Smart Choice Medical. Rather, the day-to-day operations, supervisory control, and true ownership of Smart Choice Medical rested in the hands of the Management Defendants.

79.     In order to circumvent New York law and to induce the New York State Education Department (the "Education Department") to issue a certificate of authority authorizing Smart Choice Medical to operate a medical practice, the Management Defendants entered into a secret scheme with Chumaceiro.

80.     In exchange for a designated salary or other form of compensation from the Management Defendants, Chumaceiro agreed to falsely represent in the certificate of incorporation and related filings with New York State, that he was the true shareholder, director, and officer of

Smart Choice Medical and that he truly owned, controlled, and practiced through the professional corporation.

81.     Chumaceiro agreed to falsely represent in the certificate of incorporation and related filings with New York State that he was the true shareholder, director, and officer of Smart Choice Medical and that he truly owned, controlled, and practiced through the professional corporation, knowing that the professional corporation would be used to submit fraudulent billing to insurers.

82.     Once Smart Choice Medical was fraudulently incorporated on January 4, 2016, Chumaceiro ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

83.     The Management Defendants – rather than Chumaceiro – provided all start-up costs and investment in Smart Choice Medical. In addition, Chumaceiro did not incur any costs to establish the Smart Choice Medical practice, nor did he invest any money in the professional corporation he purportedly owned.

84.     On or about February 2016, the Management Defendants caused Smart Choice Medical to commence operations at the Southern Blvd Medical Clinic – a location that the Management Defendants controlled – alongside the other professional corporations they managed and/or controlled.

85.     Thereafter, having observed their fraudulent scheme flourish at the Southern Blvd Medical Clinic, on or about June 2017, the Management Defendants caused Smart Choice Medical to commence operations at the Rockaway Ave Medical Clinic – a second location that the Management Defendants controlled – alongside the other professional corporations they managed and/or controlled.

86.     Chumaceiro never was the true shareholder, director, or officer of Smart Choice Medical, and never had any true ownership interest in or control over the professional corporation.

87.     True ownership and control over Smart Choice Medical always rested entirely with the Management Defendants, who used the facade of Smart Choice Medical to do indirectly what they were forbidden from doing directly, namely: (i) employ healthcare professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

88.     Chumaceiro exercised absolutely no control over or ownership interest in Smart Choice Medical.

89.     All decision-making authority relating to the operation and management of Smart Choice Medical was vested entirely with the Management Defendants.

90.     In addition, Chumaceiro never controlled or maintained any of Smart Choice Medical's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of Smart Choice Medical's financial affairs; never hired or supervised any of Smart Choice Medical's employees or independent contractors; and was completely unaware of fundamental aspects of how Smart Choice Medical operated.

91.     Although Chumaceiro purported to be the sole owner of Smart Choice Medical, he typically worked at Smart Choice Medical less than fifteen (15) hours per week and had no genuine involvement in managing the purported "practice" operating at either the Southern Blvd Medical Clinic or the Rockaway Ave Medical Clinic. In fact, at all relevant times, Chumaceiro worked as a staff doctor at St. John's Riverside Hospital in Yonkers, New York.

92.     By contrast, the extent to which the Management Defendants managed and controlled Smart Choice Medical allowed them to maintain total control over Smart Choice

Medical, the accounts receivable, and any revenues that were generated therefrom, all while concealing their illegal ownership and control of the PC.

93.     Specifically, and in keeping with the fact that the Management Defendants managed and controlled Smart Choice Medical, DiPietro:

> (i)     assisted Chumaceiro with incorporating Smart Choice Medical;

> (ii)    introduced Khaimov to Chumaceiro;

> (iii)   recommended the engagement of Israilov and his marketing company, All Network Marketing, to Smart Choice Medical;

> (iv)    arranged for Billing 4 You and Gulkarov to handle billing for Smart Choice Medical;

> (v)     introduced Chumaceiro to Khaimov's long-time associate, Tariel Begiyev ("Begiyev"), from whom Chumaceiro borrowed $400,000;

> (vi)    hired and fired the administrative staff;

> (vii)   controlled one of two signature stamps bearing Chumaceiro's name – Billing 4 you controlled the other;

> (viii)  handled the electronic deposits using a scanner that allowed him access to Smart Choice Medical's account; and

> (ix)    was paid $85,000 per year as the practice administrator for Smart Choice Medical at the Southern Blvd Medical Center.

94.     Furthermore, and also in keeping with the fact that the Management Defendants managed and controlled Smart Choice Medical, Smart Choice Medical: (i) leased space from Khaimov and A&P Holding for purported "rent" at the Southern Blvd Medical Clinic for $12,000 per month; (ii) paid All Network Marketing $5,000 per month of their "marketing" services; and (iii) paid $7,500 per month to Billing 4 You for their "billing" services.

95.     As indicated, Chumaceiro did not exercise control over the bills and treatment reports submitted under his name at Smart Choice Medical.

96.     The Management Defendants, while concealing their illegal ownership and control of Smart Choice Medical, were responsible for hiring and firing personnel, endorsed and deposited checks received from insurance companies on behalf of Smart Choice Medical, and had access to Smart Choice Medical's bank account.

97.     What is more, the Management Defendants controlled the leasing and financial arrangements with the Provider Defendants at the Southern Blvd Medical Clinic and the Rockaway Ave Medical Clinic.

98.     The extent to which the Management Defendants managed Smart Choice Medical allowed them to maintain total control over Smart Choice Medical, the accounts receivable, and any revenues that were generated therefrom.

99.     Smart Choice Medical was used as a vehicle by which the Management Defendants unlawfully split-fees and funneled large sums of money to themselves in contravention of New York law.

100.    Though ostensibly organized to provide a range of health care services to Insureds at two locations, the Southern Blvd Medical Clinic and the Rockaway Ave Medical Clinic were actually organized to be convenient, one-stop shops for no-fault insurance fraud.

101.    The Defendants' scheme not only unlawfully enriched the Management Defendants, but compromised patient care as Smart Choice Medical's operations were subject to the pecuniary interests of non-physicians as opposed to the independent medical judgment of true doctor-owners.

**2.      The Fraudulent Ownership and Operation of the Chiropractic Professional Corporations**

102.    The Management Defendants expanded their fraudulent scheme by recruiting licensed chiropractic professionals who were willing to sell the use of their professional licenses to

the Management Defendants so that the Management Defendants could fraudulently incorporate and/or control chiropractic professional corporations under the chiropractic professionals' name at both the Southern Blvd Medical Clinic and the Rockaway Ave Medical Clinic.

103.    Beginning in 2016, the Management Defendants recruited Quiroga and Bucci, both licensed chiropractors, who were willing to sell to the Management Defendants the use of their professional licenses, so that they could fraudulently incorporate and/or control Southern Blvd Chiropractic and Brownsville Chiro. The Management Defendants then used Southern Blvd Chiropractic and Brownsville Chiropractic to submit billing to GEICO for the Fraudulent Services that were purportedly performed at the 2 locations.

104.    Although Quiroga and Bucci are listed as the owners of record of Southern Blvd Chiropractic and Brownsville Chiropractic, respectively, on the Certificates of Incorporation, Quiroga and Bucci simply implemented the treatment protocols, and exercised no control over the profits that were generated from the operation of Southern Blvd Chiropractic and Brownsville Chiro. Rather, the day-to-day operations, supervisory control, and true ownership of Southern Blvd Chiropractic and Brownsville Chiropractic rested in the hands of the Management Defendants.

105.    In order to circumvent New York law preventing non-medical professionals from owning and controlling medical professional corporations, the Management Defendants entered into a secret scheme with Quiroga and Bucci, wherein, in exchange for a designated salary or other form of compensation, Quiroga and Bucci each agreed to falsely represent that they were the true shareholders, directors, and officers of the chiropractic professional corporations and that they truly owned, controlled, and practiced through the chiropractic professional corporations.

106.    Quiroga and Bucci each agreed to falsely represent that they were the true shareholders, directors, and officers of the chiropractic professional corporations and that they truly owned, controlled, and practiced through the chiropractic professional corporations knowing that the professional corporations were going to be used to submit fraudulent billing to insurers.

107.    The Management Defendants – rather than Quiroga and Bucci – provided all costs associated with establishing the chiropractic professional corporations at the Southern Blvd Medical Clinic and the Rockaway Ave Medical Clinic, and all investment in the chiropractic professional corporations subsequent to the purchase of Quiroga and Bucci's chiropractic licenses by the Management Defendants.

108.    Quiroga and Bucci did not incur any costs to establish the chiropractic professional corporations' practices at the Southern Blvd Medical Clinic and the Rockaway Ave Medical Clinic, nor did they invest any money in the chiropractic professional corporations they purportedly owned subsequent to the purchase of their chiropractic licenses by the Management Defendants.

109.    The Management Defendants caused Quiroga and Bucci to commence operations at the Southern Blvd Medical Clinic and the Rockaway Ave Medical Clinic, respectively, alongside the other professional corporations that the Management Defendants controlled.

110.    Quiroga and Bucci never were the true shareholders, directors, or officers of Southern Blvd Chiropractic and Brownsville Chiropractic, respectively, and never had any true ownership interest in or control over the professional corporations.

111.    True ownership and control over the chiropractic professional corporations always rested entirely with the Management Defendants, who used the facade of the chiropractic professional corporations to do indirectly what they were forbidden from doing directly, namely:

(i) employ chiropractic professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

112.   Quiroga and Bucci exercised absolutely no control over or ownership interest in Southern Blvd Chiropractic and Brownsville Chiropractic, respectively.

113.   All decision-making authority relating to the operation and management of the chiropractic professional corporations was vested entirely with the Management Defendants.

114.   In addition, Quiroga and Bucci never controlled or maintained any of Southern Blvd Chiropractic and Brownsville Chiro's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of their financial affairs; and never hired or supervised any of its employees or independent contractors.

115.   Specifically, and in keeping with the fact that the Management Defendants managed and controlled Southern Blvd Chiropractic: (i)  Southern Blvd Chiropractic paid Billing 4 You $5,000 per month to do its "billing"; (ii) Southern Blvd Chiropractic did no marketing or advertising; (iii) approximately every two weeks, Quiroga travelled to the 62-43A Woodhaven Blvd., Queens location to meet with Gulkarov and bring Billing 4 You Southern Blvd Chiropractic's checks and bills; (iv) Billing 4 You had unfettered authority to use Quiroga's electronic signature; and (v) Billing 4 You had access to Southern Blvd Chiropractic's bank account and  electronically deposited insurance checks through a scanner at Billing 4 You.

116.   Specifically, and in keeping with the fact that the Management Defendants managed and controlled Brownsville Chiropractic: (i) DiPietro introduced Bucci to the Rockaway Ave Medical Clinic; (ii) DiPietro introduced Bucci to Gulkarov and Billing 4 You; (iii) Brownsville Chiropractic paid $5,000 per month to Billing 4 You for "billing" services; (iv)

DiPietro was responsible for marketing and advertising for Brownsville Chiropractic; (v) DiPietro was responsible for "transportation services" for the Rockaway Medical Clinic; (vi) Gulkarov introduced Bucci to Begiyev from whom Bucci received a $14,000.00 loan at the inception of Brownsville Chiropractic; (v) Gulkarov introduced Bucci to an "innovative" new service called "LINT treatment"; (vi) Gulkarov then introduced Bucci to Buziashvili of Innovations Tech Group from whom Bucci rented a Nervomatrix Soleve machine for $13,000 per month in order to perform LINT treatments; and (vii) Buziashvili referred Bucci to Advanced Revenue Management, LLC, a billing company that handled Bucci's LINT service billing for a fee of 10% of Brownsville's collections on LINT services.

117.    Southern Blvd Chiropractic and Brownsville Chiropractic were essentially "plug and play entities" that were used as vehicles by the Management Defendants to unlawfully split-fees and funnel large sums of money to themselves in contravention of New York law.

118.    Defendants' scheme not only unlawfully enriched the Management Defendants, but compromised patient care as the operations of the professional chiropractor corporations were subject to the pecuniary interests of non-chiropractors as opposed to the independent medical judgment of true chiropractor-owners.

**3.    The Fraudulent Ownership and Operation of the Acupuncture Professional Corporations**

119.    The Management Defendants fraudulent scheme also involved the recruitment of licensed acupuncturists who were willing to sell the use of their professional licenses to the Management Defendants so that the Management Defendants could fraudulently incorporate and/or control a series of acupuncture professional corporations under the acupuncture professionals' name.

120.    Beginning in 2017, the Management Defendants recruited Kuroyama, Um, and Nakamura, all licensed acupuncturists, who were willing to sell to the Management Defendants the use of their professional licenses, so that they could fraudulently incorporate and/or control Sa Qi Acupuncture, Harmonized Acupuncture, and K N Acupuncture.

121.    Specifically, in 2017 the Management Defendants recruited Kuroyama, a licensed acupuncturist who was willing to sell them the use of her acupuncture license so that they could fraudulently incorporate Sa Qi Acupuncture and thereafter cause Sa Qi Acupuncture to operate at the Southern Blvd Medical Clinic. The Management Defendants used Sa Qi Acupuncture to submit billing for the Fraudulent Services to GEICO.

122.    In 2018, the Management Defendants recruited Um, a licensed acupuncturist who was willing to sell them the use of his acupuncture license so that they could fraudulently incorporate Harmonized Acupuncture and thereafter cause Harmonized Acupuncture to operate at the Rockaway Ave Medical Clinic. The Management Defendants used Harmonized Acupuncture to submit billing for the Fraudulent Services to GEICO.

123.    In 2019, the Management Defendants recruited Nakamura, a licensed acupuncturist who was willing to sell them the use of her acupuncture license so that they could fraudulently incorporate K N Acupuncture and thereafter cause K N Acupuncture to operate at the Southern Blvd Medical Clinic. The Management Defendants used K N Acupuncture to submit billing for the Fraudulent Services to GEICO.

124.    Accordingly, the Management Defendants caused the following Defendants to be established at the Southern Blvd Medical Clinic and the Rockaway Ave Medical Clinic during the following years:

|      | Southern Blvd Medical Clinic | Rockaway Ave Medical Clinic |
|------|------------------------------|----------------------------|
| 2017 | Sa Qi Acupuncture (Kuroyama) |                            |
| 2018 | Sa Qi Acupuncture (Kuroyama) | Harmonized Acupuncture (Um) |
| 2019 | K N Acupuncture (Nakamura)   | Harmonized Acupuncture (Um) |

125.    Although Kuroyama, Nakamura, and Um are listed as the "owners" of record of Sa Qi Acupuncture, K N Acupuncture, and Harmonized Acupuncture respectively, on the Certificates of Incorporation, Kuroyama, Nakamura, and Um simply implemented the treatment protocols and exercised no ownership or control over the profits that were generated from the operation of Sa Qi Acupuncture, K N Acupuncture, and Harmonized Acupuncture, respectively. Rather, the day-to-day operations, supervisory control, and true ownership of Sa Qi Acupuncture, K N Acupuncture, and Harmonized Acupuncture rested in the hands of the Management Defendants.

126.    In order to circumvent New York law preventing non-medical professionals from owning and controlling acupuncture professional corporations, the Management Defendants entered into a secret scheme with Kuroyama, Nakamura, and Um, wherein, in exchange for a designated salary or other form of compensation, Kuroyama, Nakamura, and Um each agreed to falsely represent that they were the true shareholders, directors, and officers of the acupuncture professional corporations and that they truly owned, controlled, and practiced through the acupuncture professional corporations.

127.    Kuroyama, Nakamura, and Um each agreed to falsely represent that they were the true shareholders, directors, and officers of the acupuncture professional corporations and that they truly owned, controlled, and practiced through the acupuncture professional corporations, knowing that the professional corporations were going to be used to submit fraudulent billing to insurers.

128.    The Management Defendants – rather than Kuroyama, Nakamura, and Um – provided all costs associated with establishing the acupuncture professional corporations in the Southern Blvd Medical Clinic and the Rockaway Ave Medical Clinic, and all investment in the acupuncture professional corporations subsequent to the purchase of Kuroyama, Nakamura, and Um's acupuncture licenses by the Management Defendants.

129.    Kuroyama, Nakamura, and Um did not incur any costs to establish the acupuncture professional corporations' practices at the Southern Blvd Medical Clinic and the Rockaway Ave Medical Clinic, nor did they invest any money in the acupuncture professional corporations they purportedly owned subsequent to the purchase of their acupuncture licenses by the Management Defendants.

130.    The Management Defendants caused Kuroyama, Nakamura, and Um to commence operations at the Southern Blvd Medical Clinic and the Rockaway Ave Medical Clinic, alongside the other professional corporations that the Management Defendants controlled.

131.    Kuroyama, Nakamura, and Um never were the true shareholders, directors, or officers of Sa Qi Acupuncture, K N Acupuncture, and Harmonized Acupuncture, respectively, and never had any true ownership interest in or control over the professional corporations.

132.    True ownership and control over the acupuncture professional corporations always rested entirely with the Management Defendants, who used the facade of the acupuncture professional corporations to do indirectly what they were forbidden from doing directly, namely: (i) employ acupuncture professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

133.    All decision-making authority relating to the operation and management of the acupuncture professional corporations was vested entirely with the Management Defendants.

134.    In addition, Kuroyama, Nakamura, and Um never controlled or maintained any of Sa Qi Acupuncture, K N Acupuncture, and Harmonized Acupuncture's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of their financial affairs; never hired or supervised any of its employees or independent contractors; and were completely unaware of fundamental aspects of how Sa Qi Acupuncture, K N Acupuncture, and Harmonized Acupuncture operated.

135.    In keeping with the fact that the licensed acupuncturists lacked ownership and control over the professional corporations, Um worked five days per week from 11 a.m. to 7 p.m. at a competing acupuncture professional corporation and was present at the Rockaway Ave Medical Clinic for only one hour per week. Um also used no advertising or marketing services at Harmonized Acupuncture.

136.    Sa Qi Acupuncture, K N Acupuncture, and Harmonized Acupuncture were used as vehicles by which the Management Defendants unlawfully split-fees and funneled large sums of money to themselves in contravention of New York law.

137.    Defendants' scheme not only unlawfully enriched the Management Defendants, but compromised patient care as the operations of the acupuncture professional corporations were subject to the pecuniary interests of non-acupuncturists as opposed to the independent medical judgment of true acupuncturists-owners.

**B.      The Management Defendants' Efforts to Conceal Their Ownership and Control of the Provider Defendants By Imposing Sham Financial Arrangements**

138.    The Management Defendants used each of the Provider Defendants as vehicles so that they could illegally profit from the Fraudulent Services, unlawfully split fees, and funnel large sums of money to themselves in contravention of New York law.

139.    To conceal their illegal financial and referral relationships, and true ownership and control of the Provider Defendants while simultaneously effectuating pervasive, total control over their operation and management, the Management Defendants arranged to have the Nominal Owner Defendants and the Provider Defendants enter into sham  "management," "billing," "collection," "transportation," "lease," "marketing" agreements, and/or other financial arrangements.

140.    These agreements or financial arrangements called for payments that were purportedly for the performance of certain designated services including management, marketing, billing, collections, transportation, leasing, etc., but were in actuality (i) sham agreements and arrangements; (ii) not reflective of the fair market value or the actual value of the services provided; and (iii) decoys to conceal the Management Defendants' illegal ownership and control over the Provider Defendants.

141.    In fact, the agreements and financial arrangements were created, dictated, and imposed by the Management Defendants upon the Provider Defendants to present the illusion that the Provider Defendants were paying legitimate fees for "management," "billing," "collection," "transportation," and "marketing" services, and/or for facility space and equipment, but they actually were used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own the Provider Defendants and (ii) siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through the Provider Defendants.

142.    The net effect of these "management," "billing," "collection," "transportation," "marketing," "lease," and/or other financial arrangements, was to maintain the Provider Defendants in a constant state of debt to the Management Defendants, thereby enabling the

Management Defendants to maintain total control over the professional corporations and healthcare practices, their accounts receivable, and all revenues generated therefrom.

143.    Through all of these "billing," "collection," "management," "transportation," "marketing" and/or "lease" agreements, the Management Defendants maintained complete control of all of the healthcare providers operating at the Southern Blvd Medical Clinic and the Rockaway Ave Medical Clinic, their accounts receivable, and all revenues that generated therefrom.

144.    The Management Defendants used the Provider Defendants as vehicles so that they could illegally profit from professional healthcare services, unlawfully split fees, and funnel large sums of money to themselves in contravention of New York law.

### C.    Defendants' Fraudulent Treatment and Billing Protocol

145.    Defendants, using a fraudulent treatment and billing protocol, executed a complex fraudulent scheme designed to bill GEICO and the New York automobile insurance industry for the performance of the Fraudulent Services.

146.    The Provider Defendants, in accordance with Defendants' pre-determined fraudulent treatment and billing protocol, subjected the Insureds to a myriad of illusory and medically unnecessary healthcare services.

147.    Defendants thereafter purported to subject virtually every Insured to a medically unnecessary course of "treatment" – regardless of the severity of the accident or the nature of the Insured's injuries (or lack of any injuries) -- that was provided pursuant to a pre-determined, fraudulent protocol designed to maximize the billing that Defendants could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who were subjected to it.

148.    As part of the scheme, Defendants purported to subject the Insureds to medically unnecessary "testing" provided pursuant to a pre-determined, fraudulent protocol, which was applied without regard for the Insureds' individual symptoms or presentment, or absence of any actual medical problems arising from any actual automobile accidents.

149.    Each step in the fraudulent testing and treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

150.    Patients purportedly underwent an initial examination, and as a result, each patient was diagnosed with conditions that varied little, with the examining provider consistently concluding that the same predetermined, excessive, and unnecessary treatment was medically necessary for each patient. The examinations invariably led to voluminous physical therapy treatments, chiropractic services, acupuncture services, and diagnostic testing consisting of digital range of motion and muscle testing, outcome assessment testing, physical performance testing, and for certain patients, neurological consultations followed by nerve conduction velocity tests and electromyography tests.

151.    No legitimate physician would have permitted the fraudulent treatment and billing protocol described below to proceed under his or her auspices.

152.    The Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because: (i) the Provider Defendants were secretly and unlawfully owned and controlled by the Management Defendants -- non-physicians whose focus was on profit rather than on patient care; and (ii) Defendants sought to profit from the fraudulent billing submitted to GEICO and other insurers.

1.      **The Fraudulent Initial Examinations**

153.      Smart Choice Medical and Chumaceiro purported to provide virtually every Insured in the claims identified in Exhibit "1" with an initial examination.

154.      The initial examinations were performed – to the extent that they were performed at all – to provide Insureds with pre-determined diagnoses to allow for the performance of a host of medically unnecessary or illusory services.

155.      Typically, Chumaceiro or another medical professional employed by or associated with Smart Choice Medical purported to provide the initial examinations at the Southern Blvd Medical Clinic and the Rockaway Ave Medical Clinic.

156.      Smart Choice Medical and Chumaceiro (along with the Management Defendants, collectively referred herein as the "Examining Defendants") typically billed the initial examinations to GEICO under current procedural terminology ("CPT") codes: (i) 99205, typically resulting in a charge of $200.68 per exam; or (ii) 99204, typically resulting in a charge of $148.69.

157.      The charges for the initial examinations were fraudulent in that the examinations were medically unnecessary and were performed – to the extent they were performed at all – pursuant to the fraudulent treatment protocol established by the Management Defendants and their illegal kickback and referral scheme, not to treat or otherwise benefit the Insureds.

158.      Furthermore, the charges for the initial examinations were fraudulent in that they misrepresented the nature and extent of the initial examinations.

159.      According to the New York Workers' Compensation Medical Fee Schedule (the "Fee Schedule"), which is applicable to claims for No-Fault Benefits, the use of CPT code 99205

typically requires that the physician spend at least 60 minutes of face-to-face time with the Insured or the Insured's family.

160.    Along similar lines, the use of CPT code 99204 typically requires that the physician spend at least 45 minutes of face-to-face time with the Insured or the Insured's family.

161.    Though the Examining Defendants routinely billed for the initial examinations under CPT codes 99204 and 99205, no medical practitioner employed by or associated with Smart Choice Medical ever spent 45 minutes of face-to-face time with the Insureds or their families during the initial examinations, much less 60 minutes. Rather, the initial examinations rarely lasted more than 20 minutes, to the extent that they were conducted at all.

162.    In keeping with the fact that the initial examinations rarely lasted more than 20 minutes, much less 60 minutes, the Examining Defendants used boilerplate forms in documenting the initial examinations, setting forth a very limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

163.    All that was required to complete the boilerplate forms was a cursory patient interview and a cursory physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, basic range of motion and muscle strength testing, and basic neurological testing.

164.    These interviews and examinations did not require any medical professional employed by or associated with Smart Choice Medical to spend more than 20 minutes of face-to-face time with the Insureds, let alone 60 minutes.

165.    According to the Fee Schedule, the use of CPT codes 99204 and 99205 typically requires that the Insured presented with problems of moderate or moderate-to-high severity.

166.    Though the Examining Defendants routinely billed for the initial examinations under CPT codes 99204 and 99205, the Insureds did not present with problems of moderate severity, let alone moderate-to-high severity, as the result of any automobile accident. Rather, to the extent that the Insureds had any health problems at all as the result of any automobile accidents, the problems almost always were of low severity.

167.    What is more, even though the Insureds almost never presented with problems of moderate-to-high severity as the result of any automobile accident, in the unlikely event that an Insured was to present with problems of moderate-to-high severity, the deficient initial examinations performed were incapable of assessing and/or diagnosing problems of such severity.

168.    In addition, according to the Fee Schedule, when the Examining Defendants submitted charges for initial examinations under CPT code 99204, they represented that they: (i) took a "comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

169.    Further, according to the Fee Schedule, when the Examining Defendants submitted charges for initial examinations under CPT code 99205, they represented that they: (i) took a "comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; and (iii) engaged in medical decision-making of "high complexity."

(i)    Misrepresentations Regarding "Comprehensive" Patient Histories

170.    Pursuant to the American Medical Association's CPT Assistant (the "CPT Assistant"), which is incorporated by reference into the Fee Schedule, a patient history does not qualify as "comprehensive" unless the physician has conducted a "complete" review of the patient's systems.

171.    Pursuant to the CPT Assistant, a physician has not conducted a "complete" review of a patient's systems unless the physician has documented a review of the systems directly related to the history of the patient's present illness, as well as at least 10 other organ systems.

172.    The CPT Assistant recognizes the following organ systems with respect to a review of systems:

(i)      constitutional symptoms (e.g., fever, weight loss);

(ii)     eyes;

(iii)    ears, nose, mouth, throat;

(iv)     cardiovascular;

(v)      respiratory;

(vi)     gastrointestinal;

(vii)    genitourinary;

(viii)   musculoskeletal;

(ix)     integumentary (skin and/or breast);

(x)      neurological;

(xi)     psychiatric;

(xii)    endocrine;

(xiii)   hematologic/lymphatic; and

(xiv)    allergic/immunologic.

173.    When the Examining Defendants billed for the initial examinations under CPT codes 99204 or 99205, they falsely represented that they took a "comprehensive" patient history from the Insureds they purported to treat during the initial examinations.

174.   In fact, no Examining Defendants ever took a "comprehensive" patient history from the Insureds they purported to treat during the initial examinations, because they did not document a review of 10 organ systems unrelated to the history of the patients' present illnesses.

175.   Rather, after purporting to provide the initial examinations, the Examining Defendants simply prepared reports containing ersatz patient histories which falsely contended that the Insureds continued to suffer from injuries they sustained in automobile accidents.

176.   These phony patient histories did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the laundry-list of Fraudulent Services that Defendants purported to provide and then billed to GEICO and other insurers.

(ii)   <u>Misrepresentations Regarding "Comprehensive" Physical Examinations</u>

177.   Moreover, pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the healthcare provider either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

178.   Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a general examination of multiple patient organ systems unless the physician has documented findings with respect to at least eight organ systems.

179.   Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)   at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)   the general appearance of the patient – <u>e.g.</u>, development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)    examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)    coordination, deep tendon reflexes, and sensation; and

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

180.    When the Examining Defendants billed for the initial examinations under CPT codes 99204 or 99205, they falsely represented that they performed a "comprehensive" patient examination on the Insureds they purported to treat during the initial examinations.

181.    In fact, no Examining Defendants ever conducted a general examination of multiple patient organ systems, or conducted a complete examination of a single patient organ system.

182.    For instance, no Examining Defendants ever conducted any general examination of multiple patient organ systems, inasmuch as they did not document findings with respect to at least eight organ systems.

183.    Furthermore, although the Examining Defendants often purported to provide a more in-depth examination of the Insureds' musculoskeletal systems during their putative initial

examinations, the musculoskeletal examinations did not qualify as "complete", because they failed to document:

(i)     at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)   palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)    examination of gait and station;

(vi)   examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)  inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii) coordination, deep tendon reflexes, and sensation; and

(ix)   mental status, including orientation to time, place and person, as well as mood and affect.

(iii)   <u>Misrepresentations Regarding the Extent of Medical Decision-Making</u>

184.   In addition, when the Examining Defendants submitted charges for initial examinations under CPT code 99205, they represented that they engaged in medical decision-making of "high complexity."

185.   Similarly, when the Examining Defendants submitted charges for initial examinations under CPT code 99204, they represented that they engaged in medical decision-making of "moderate complexity."

186.    Pursuant to the Fee Schedule, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

187.    Though the Examining Defendants routinely falsely represented that their initial examinations involved medical decision-making of "high complexity" (when billed under CPT code 99205) or "moderate complexity" (when billed under CPT code 99204), in actuality the initial examinations did not involve any medical decision-making at all, and, in the unlikely event that an Insured did present with such injuries or symptoms, the deficient initial examinations were incapable of assessing and/or diagnosing them as such.

188.    First, the initial examinations did not involve the retrieval, review, or analysis of any medical records, diagnostic tests, or other information. When the Insureds presented to the Examining Defendants for "treatment" at the Southern Blvd Medical Clinic or Rockaway Ave Medical Clinic pursuant to Defendants' illegal kickback scheme, they did not arrive with any medical records. Furthermore, prior to the initial examinations, the Examining Defendants did not request any medical records from any other providers, nor conducted any diagnostic tests.

189.    Second, there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

190.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the Examining

Defendants, to the extent that the Examining Defendants provided any such diagnostic procedures or treatment options in the first instance. In the unlikely event that such risks did exist, the deficient initial examinations were incapable of identifying such risks.

191.   In almost every instance, any diagnostic procedures and "treatments" the Examining Defendants actually provided were limited to a series of medically unnecessary pain management modalities and diagnostic tests, none of which were health- or life-threatening if properly administered.

192.   Third, the Examining Defendants did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

193.   Rather, to the extent that the initial examinations were conducted in the first instance, the Examining Defendants provided a nearly identical, pre-determined "diagnosis" for the Insureds, and prescribed a similar course of treatment for each Insured.

194.   The Examining Defendants prepared phony initial examination/consultation reports in which they provided boilerplate sprain and strain diagnoses to virtually every Insured.

195.   Based upon these supposed "diagnoses", the Examining Defendants directed Insureds to return to the Southern Blvd Medical Clinic or the Rockaway Ave Medical Clinic several times per week for medically unnecessary follow-up examinations, physical therapy, diagnostic testing, chiropractic treatment, and acupuncture.

196.   The putative results of the initial examinations did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the laundry-list of Fraudulent Services that Defendants purported to perform and then billed to GEICO and other insurers.

### 2. The Fraudulent Follow-Up Examinations

197.    In addition to the fraudulent initial examinations, the Examining Defendants typically purported to subject Insureds to one or more fraudulent follow-up examinations during the course of its fraudulent treatment protocol.

198.    The Examining Defendants virtually always billed the follow-up examinations to GEICO under CPT code 99213, typically resulting in a charge of $64.07 or CPT code 99214, typically resulting in a charge of $92.98.

199.    Like the Examining Defendants' charges for the initial examinations, the charges for the follow-up examinations were fraudulent in that the follow-up examinations were medically unnecessary and were performed – to the extent they were performed at all – pursuant to the Management Defendants directive, as well as the illegal kickbacks and fraudulent treatment protocol.

200.    The charges for the follow-up examinations also were fraudulent in that they misrepresented the extent of the follow-up examinations.

201.    The use of CPT code 99213 typically requires that the physician spend 15 minutes of face-to-face time with the Insured or the Insured's family.

202.    Along similar lines, the use of CPT code 99214 typically requires that the physician spend 25 minutes of face-to-face time with the Insured or the Insured's family.

203.    Though the Examining Defendants routinely billed for the follow-up examinations under CPT codes 99213 or 99214, no physician associated with the Examining Defendants ever spent 15 minutes of face-to-face time with the Insureds or their families during the follow-up examinations, much less 25 minutes. Rather, the follow-up examinations rarely lasted more than 10 minutes, to the extent that they were conducted at all.

204.    In most cases, the Examining Defendants did not actually provided any legitimate follow-up examination but instead issued bogus, boilerplate "follow-up examination" reports to further support the laundry-list of Fraudulent Services that Defendants purported to perform and then billed to GEICO and other insurers.

### 3.    The Fraudulent "Outcome Assessment Testing"

205.    The vast majority of Insureds were also subjected to one or more sessions of medically useless "outcome assessment testing," generally on the same dates they were subjected to initial or follow-up examinations.

206.    Defendants billed the "outcome assessment tests" allegedly performed by Chumaceiro and Smart Choice Medical (along with the Management Defendants, collectively referred as the "OAT Defendants") to GEICO under CPT code 99358, generally resulting in a charge of $204.41 for each round of "testing."

207.    Like the charges for the other Fraudulent Services, the charges for the "outcome assessment tests" were fraudulent in that the tests were medically unnecessary and, even when actually performed, were performed pursuant to the Management Defendants' directive and Defendants' illegal kickback and runner scheme, not to treat or otherwise benefit the Insureds.

208.    The "outcome assessment tests" that the OAT Defendants purported to provide Insureds were simply pre-printed, multiple-choice questionnaires on which the Insureds were invited to report the symptoms they purportedly were experiencing, and the impact of those symptoms on their lives.

209.    Because a patient history and physical examination must be conducted as an element of a soft-tissue trauma patient's initial and follow-up examinations, and because the "outcome assessment tests" that the OAT Defendants purported to provide were nothing more

than a questionnaire regarding the Insureds' physical condition, the Fee Schedule provides that the "outcome assessment tests" should have been reimbursed as an element of the patients' initial examinations and follow-up examinations. In other words, healthcare providers cannot conduct and bill for a patient's initial examination or follow-up examination, then bill separately for contemporaneously-provided "outcome assessment tests."

210. The information gained through the use of the "outcome assessment tests" that the OAT Defendants purported to provide was not significantly different from the information that the Examining Defendants purported to obtain during the Insureds' initial and follow-up examinations.

211. Under the circumstances employed by the OAT Defendants, the "outcome assessment tests" represented purposeful and unnecessary duplication of the patient examinations purportedly conducted during the Insureds' initial and follow-up examinations. The "outcome assessment tests" were part and parcel of Defendants' fraudulent scheme, inasmuch as the "service" was rendered pursuant to a pre-determined protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich Defendants.

212. The OAT Defendants use of CPT code 99358 to bill for the "outcome assessment tests" also constituted a deliberate misrepresentation of the extent of the service that was provided. Pursuant to the Fee Schedule, the use of CPT code 99358 represents – among other things – that a physician actually spent at least one hour performing some prolonged service, such as review of extensive records and tests, or communication with the patient and his or her family.

213.    Though the OAT Defendants routinely submitted billing for the "outcome assessment tests" under CPT code 99358, no physician employed by or associated with Smart Choice Medical ever spent an hour reviewing or administering the tests or, indeed, any time at all reviewing or administering the tests.

214.    Indeed, the "outcome assessment tests" did not require any physician involvement at all, inasmuch as the "tests" simply were questionnaires that were completed by the Insureds.

215.    Nevertheless, as identified in Exhibit "1", the OAT Defendants submitted billing to GEICO for "outcome assessment testing" under CPT code 99358.

216.    In keeping with the fact that the "outcome assessment tests" were medically unnecessary and were performed pursuant to Defendants' pre-determined fraudulent treatment protocol, the results of the "outcome assessment tests", like the other Fraudulent Services, were not incorporated into the Insureds' respective treatment plans.

**4.      The Fraudulent Computerized Range of Motion and Muscle Tests**

217.    In addition to the other Fraudulent Services, many Insureds were subjected to one or more sessions of medically useless computerized range of motion and muscle testing ("ROM/MT") in an attempt to maximize the fraudulent billing submitted to GEICO.

218.    Like the charges for the other Fraudulent Services, the charges for the ROM/MT were fraudulent in that the ROM/MT were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to Defendants' pre-determined fraudulent treatment protocol that was designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to it.

219.    Chumaceiro and Smart Choice Medical (along with the Management Defendants, referred herein as the "ROM/MT Defendants") typically purported to provide ROM/MT at the

Southern Blvd Medical Clinic and at the Rockaway Ave Medical Clinic and submit billing for such testing to GEICO.

220.    The ROM/MT Defendants submitted bills for ROM/MT to GEICO under multiple units of CPT codes 95851 and 95831, generally resulting in total charges ranging from $270.04 to $714.48 for each session of ROM/MT "testing."

221.    The ROM/MT Defendants typically billed the computerized range of motion tests to GEICO as multiple charges of $45.71 under CPT code 95851, generally for each round of testing.

222.    The ROM/MT Defendants typically billed the computerized muscle strength tests to GEICO as multiple charges of $43.60 under CPT code 95831, generally for each round of testing.

223.    Like Defendants' charges for the other Fraudulent Services, the charges for the ROM/MT were fraudulent in that the ROM/MT were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to illegal kickbacks and Defendants' fraudulent treatment protocol.

(i)    Traditional Tests to Evaluate the Human Body's Range of Motion and Muscle Strength

224.    The adult human body is made up of 206 bones joined together at various joints that either are of the fixed, hinged, or ball-and-socket variety. The body's hinged joints and ball-and-socket joints facilitate movement, allowing a person to – for example – bend a knee, rotate a shoulder, or move the neck to one side.

225.    The measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion". Stated in a more illustrative way, range of motion is the degree of movement at the joint.

226.    A traditional, or manual, range of motion test consists of a non-electronic measurement of the movement at the joint in comparison with an unimpaired or "ideal" joint.  In a traditional range of motion test, the limb actively or passively is moved around the joints. The physician then evaluates the patient's range of motion either by sight or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

227.    Similarly, a traditional muscle strength test consists of a non-electronic measurement of muscle strength, which is accomplished by having the patient move his/her body or extremity in a given direction against resistance applied by the physician. For example, if a physician wanted to measure muscle strength in the muscles proximate to a patient's knee, he or she would apply resistance against the patient's leg while having him/her move the leg up, then apply resistance against the patient's leg while having him/her move the leg down.

228.    Physical examinations performed on patients with soft-tissue trauma include range of motion and muscle strength tests, inasmuch as these tests provide a reference for injury assessment and treatment planning. Unless a physician knows the extent of a given patient's joint or muscle strength impairment, it will limit substantially the ability to properly diagnose or treat the patient's injuries. Evaluation of range of motion and muscle strength is an essential component of the "hands-on" examination of a trauma patient.

229.    Since range of motion and muscle strength tests are conducted as an element of a soft-tissue trauma patient's initial examination, as well as during any follow-up examinations, the Fee Schedule provides that range of motion and muscle strength tests are to be reimbursed as an element of the examinations.

230.   In other words, healthcare providers cannot conduct and bill for an initial examination or follow-up examination, then bill separately for contemporaneously-provided range of motion and muscle strength tests.

(ii)   The ROM/MT Defendants' Duplicate Billing for Medically Unnecessary ROM/MT

231.   To the extent that the Examining Defendants actually provided the examinations that were billed to GEICO, the Examining Defendants provided manual range of motion tests and manual muscle strength tests to each Insured during each examination.

232.   The charges for the manual range of motion and manual muscle strength tests were part and parcel of the charges that the Examining Defendants routinely submitted for the initial examinations under CPT codes 99204 or 99205, and for the follow-up examinations under CPT codes 99213 or 99214.

233.   Despite the fact that the ROM/MT Defendants knew that the Insureds already purportedly had undergone manual range of motion and muscle testing during their examinations, and despite the fact that the ROM/MT Defendants knew that reimbursement for range of motion and muscle testing already had been paid by GEICO as a component of reimbursement for the examinations, the ROM/MT Defendants systemically billed for, and purported to provide, ROM/MT to Insureds.

234.   Though the Insureds routinely visited the Southern Blvd Medical Clinic and the Rockaway Ave Medical Clinic several times per month for follow-up examinations and other Fraudulent Services, the ROM/MT Defendants often deliberately scheduled separate appointments for ROM/MT so that they could bill for those procedures separately, without having to include them in the billing for the follow-up examinations, as required by the Fee Schedule.

235.     The ROM/MT Defendants purported to provide the computerized range of motion tests by placing a digital inclinometer or goniometer on various parts of the Insureds' bodies while the Insured was asked to attempt various motions and movements. The test was virtually identical to the manual range of motion testing that is described above and that purportedly was performed during each examination, except that a digital printout was obtained rather than the provider manually documenting the Insured's range of motion.

236.     The ROM/MT Defendants purported to provide the computerized muscle strength tests by placing a strain gauge-type measurement apparatus against a stationary object, against which the Insured was asked to press three-to-four separate times using various muscle groups. As with the computerized range of motion tests, this computerized muscle strength test was virtually identical to the manual muscle strength testing that is described above and that purportedly was performed during the initial examinations and follow-up examinations – except that a digital printout was obtained.

237.     The information gained through the use of the ROM/MT was not significantly different from the information obtained through the manual testing that was part and parcel of each Insured's initial and follow-up examinations. In the relatively minor soft-tissue injuries allegedly sustained by the Insureds, the difference of a few percentage points in the Insured's range of motion reading or pounds of resistance in the Insured's muscle strength testing was meaningless.

238.     While ROM/MT can be a medically useful tool as part of a research project, under the circumstances employed by the ROM/MT Defendants it represented purposeful and unnecessary duplication of the manual range of motion and muscle strength testing purportedly conducted during virtually every Insured's initial examination and follow-up examinations.

239.    The ROM/MT were part and parcel of Defendants' interrelated fraudulent schemes, inasmuch as the "service" was rendered pursuant to a pre-established protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich Defendants.

(iii)    <u>The Fraudulent Unbundling of Charges for the Computerized Range of Motion and Muscle Strength Tests</u>

240.    Not only did the ROM/MT Defendants deliberately purport to provide duplicative, medically unnecessary computerized range of motion and muscle strength tests, the ROM/MT Defendants also unbundled their billing for the tests in order to maximize the fraudulent charges that they could submit to GEICO.

241.    Pursuant to the Fee Schedule, when computerized range of motion testing and muscle testing are performed on the same date, all of the testing should be reported and billed using CPT code 97750.

242.    CPT code 97750 is a "time-based" code that – in the New York metropolitan area – allows for a single charge of $45.71 for every 15 minutes of testing that is performed. Thus, if a provider performed 15 minutes of computerized range of motion and muscle testing, it would be permitted a single charge of $45.71 for the ROM/MT under CPT code 97750. If the provider performed 30 minutes of computerized range of motion and muscle testing, it would be permitted to submit two charges of $45.71 for the ROM/MT under CPT code 97750, resulting in total charges of $91.42, and so forth.

243.    The ROM/MT Defendants purported to provide computerized range of motion and muscle strength tests to Insureds on the same dates of service.

244.    To the extent the ROM/MT Defendants actually provided the computerized range of motion and muscle strength tests to Insureds in the first instance, the computerized range of

motion and muscle strength tests – together – never took more than 15 minutes to perform. Thus, even if the ROM/MTs that the ROM/MT Defendants purported to provide were medically necessary, and performed in the first instance, Defendants would be limited to a single, time-based charge of $45.71 under CPT code 97750 for each date of service on which they performed ROM/MT on an Insured.

245.    In order to maximize their fraudulent billing for the ROM/MT, the ROM/MT Defendants unbundled what should have been – at most – a single charge of $45.71 under CPT code 97750 for both computerized range of motion and muscle testing into: (i) multiple charges of $43.60 under CPT code 95831 (for the muscle strength tests); and (ii) multiple charges of $45.71 under CPT code 95851 (for the range of motion tests).

246.    By unbundling what should – at most – have been a single $45.71 charge under CPT code 97750 into multiple charges under CPT codes 95831, and 95851 the ROM/MT Defendants typically inflated the fraudulent ROM/MT charges that they submitted to GEICO by an order of magnitude.

(iv)    The Fraudulent Misrepresentations as to the Existence of Written, Interpretive Reports Regarding the ROM/MT

247.    Not only were the ROM/MT Defendants' charges for the ROM/MT fraudulent because the tests were medically unnecessary, and because the billing was fraudulently unbundled, but the charges also were fraudulent because they falsely represented that the ROM/MT Defendants prepared written reports interpreting the test data.

248.    Pursuant to the Fee Schedule, when a healthcare provider submits a charge for computerized range of motion testing using CPT codes 95851 or for computerized muscle testing using CPT codes 95831, the provider represents that it has prepared a written report interpreting the data obtained from the test.

249.    Though the ROM/MT Defendants routinely submitted billing for the computerized range of motion and muscle strength tests using CPT codes 95851 and 95831, Defendants did not prepare written reports interpreting the data obtained from the tests.

250.    The ROM/MT Defendants did not prepare written reports interpreting the data obtained from the tests because the tests were not meant to impact any Insured's course of treatment. Rather, to the extent they were performed at all, the tests were provided as part of Defendants' pre-determined fraudulent treatment protocol, and were designed solely to financially enrich Defendants at the expense of GEICO and other insurers.

251.    In keeping with the fact that the ROM/MT were medically unnecessary and were performed pursuant to Defendants' pre-determined fraudulent treatment protocol, the results of the ROM/MT, like the other Fraudulent Services, were not incorporated into the Insureds' respective treatment plans.

### 5.    The Fraudulent Charges for Physical Performance Tests

252.    In addition to the other Fraudulent Services, many Insureds were subjected to medically useless "physical performance testing" ("PPT") at the direction of the Management Defendants.

253.    Like the charges for the other Fraudulent Services, the charges for the PPT were fraudulent in that the PPT were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to Defendants' pre-determined fraudulent treatment protocol that was designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to it.

254.    Chumaceiro and Smart Choice Medical (along with the Management Defendants, referred herein as the "PPT Defendants") typically purported to provide PPT at the Southern

Blvd Medical Clinic and at the Rockaway Ave Medical Clinic and submit billing for such testing to GEICO.

255.    The PPT Defendants submitted bills for PPT to GEICO under multiple units of CPT codes 97750, generally resulting in a total charge of $274.26 for each session of PPT.

256.    The PPT Defendants purported to provide PPT tests to Insureds despite their actual knowledge that the PPT tests, to the extent that they were performed at all, were medically unnecessary and duplicative of the manual range of motion and muscle strength tests that were performed during every examination and/or the computerized ROM tests and muscle strength tests that frequently were purported to be performed on intervening dates.

257.    Much like the duplicative computerized ROM tests and muscle strength tests, the only substantive difference between PPT tests and the manual range of motion and manual muscle strength tests purportedly provided by the Examining Defendants during the examinations, is that PPT tests generates a digital printout of an Insured's range of motion and/or muscle strength.

258.    The range of motion and muscle strength data obtained through the use of PPT tests are not significantly different from the information obtained through the manual testing that was part and parcel of the examinations purportedly provided by Defendants to Insureds.

259.    Nor were the range of motion and muscle strength data obtained through the use of PPT tests significantly different from the data that the ROM/MT Defendants obtained through the computerized range of motion and muscle strength tests they purported to provide to Insureds.

260.    In keeping with the fact that PPT tests was medically unnecessary and was performed pursuant to Defendants' pre-determined fraudulent treatment protocol, the results of

PPT tests, like the other Fraudulent Services, were never incorporated into the Insureds' respective treatment plans.

### 6.    The Fraudulent Neurological Consultations and Electrodiagnostic Tests

261.    Based upon the fraudulent, pre-determined "diagnoses" the Examining Defendants purported to provide to Insureds during the ersatz initial "examinations", Defendants purported to subject many Insureds to a series of medically unnecessary electrodiagnostic tests, including nerve conduction velocity ("NCV") and electromyography ("EMG") tests (collectively, the "electrodiagnostic" or "EDX" tests).

262.    Chumaceiro and Smart Choice Medical (along with the Management Defendants, referred herein as the "EDX Defendants") typically purported to provide the electrodiagnostic tests at the Southern Blvd Medical Clinic and at the Rockaway Ave Medical Clinic and submit billing for such testing to GEICO.

263.    The EDX Defendants virtually always billed the electrodiagnostic tests to GEICO as multiple charges using CPT codes 95861, 95864, 95903, 95904, and 95934, which almost always resulted in charges of at least $1,500.00, but usually more than $3,000.00, for each Insured on whom the electrodiagnostic testing purportedly was performed.

264.    Like the charges for the other Fraudulent Services, the charges for the neurological consultations and EDX tests were fraudulent in that the neurological consultations and EDX tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to Defendants' pre-determined fraudulent treatment protocol that was designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to it.

(i)    The Human Nervous System and Electrodiagnostic Testing

265.    The human nervous system is composed of the brain, spinal cord, spinal nerve roots, and peripheral nerves that extend throughout the body, extending through the arms and legs and into the hands and feet.

266.    Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

267.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.

268.    Peripheral nerves consist of both sensory and motor fibers. They carry electrical impulses throughout the body, to and from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

269.    The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots. A "pinched" nerve root is called a radiculopathy, and can cause various symptoms and signs including pain, altered sensation, atrophy, loss of muscle control, and alteration of reflexes.

270.    EMG tests and NCV tests are forms of electrodiagnostic tests, and purportedly were provided to Insureds because they were medically necessary to determine whether the Insureds had radiculopathies.

271.    The American Association of Neuromuscular and Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely

to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

272.     The Recommended Policy accurately reflects the demonstrated utility of certain forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

(ii)     <u>The Fraudulent Charges for NCV Testing</u>

273.     NCVs are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured, and recorded with electrodes attached to the surface of the skin. An EMG/NCV machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance (the "conduction velocity").

274.     In addition, the EMG/NCV machine displays the changes in amplitude over time as a "waveform". The amplitude, latency, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

275.     There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCV tests.

276.     F-wave and H-reflex studies are additional types of NCV tests that may be performed in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies

generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory nerve NCV tests are designed to evaluate nerve conduction in nerves within a limb.

277.   According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies.

278.   Even so, in an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, the EDX Defendants routinely purported to perform testing on far more nerves than recommended by the Recommended Policy.

279.   Specifically, to maximize the fraudulent charges they could submit to GEICO and other insurers, the EDX Defendants routinely purported to perform and/or provide: (i) NCV tests of 4-8 motor nerves; (ii) NCV tests of 4-10 sensory nerves; (iii) multiple F-wave studies; and (iv) at least two H-reflex studies, all supposedly to determine whether the Insureds suffered from a radiculopathy.

280.   Assuming that all other conditions of coverage are satisfied, the Fee Schedule permits lawfully licensed physicians in the metropolitan New York area to submit maximum charges of: (i) $106.47 under CPT code 95904 for each sensory nerve in any limb on which NCVs test is performed; (ii) $166.47 under CPT code 95903 for each motor nerve with F-wave in any limb on which NCV testing is performed; and (iii) $119.99 under CPT code 95934 for each H-reflex test that is performed on the nerves of the lower limb.

281.   The EDX Defendants routinely purported to provide and/or perform NCVs on far more nerves than recommended by the Recommended Policy in order to maximize the

fraudulent charges that they could submit to GEICO and other insurers, not because the NCV tests were medically necessary to determine whether the Insureds have radiculopathies or any other medical condition.

282.    What is more, the decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

283.    In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers.

284.    As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCV tests should vary from patient-to-patient.

285.    This concept is emphasized in the Recommended Policy, which states that:

> EDX studies [such as NCVs] are individually designed by the electrodiagnostic consultant for each patient.  The examination design is dynamic and often changes during the course of the study in response to new information obtained.

286.    This concept also is emphasized in the CPT Assistant, which states that "Pre-set protocols automatically testing a large number of nerves are not appropriate."

287.    Even so, the EDX Defendants did not tailor the NCV tests they purported to perform and/or provide to the unique circumstances of each individual Insured.

288.    Instead, they applied a fraudulent "protocol" and purported to perform and/or provide NCV tests on the same peripheral nerves and nerve fibers in the NCV test claims identified in Exhibit "1".

289.    Though the NCVs are allegedly rendered to Insureds in order to determine whether the Insureds suffered from radiculopathies, there was no adequate neurological history

and examination performed to create a foundation for the EDX testing. In actuality, NCV tests were provided to Insureds – to the extent that they provided them at all – as part of the pre-determined, fraudulent treatment protocol designed to maximize the billing that could be submitted for each Insured.

290. The cookie-cutter approach to the NCV tests that the EDX Defendants purported to provide to Insureds clearly was not based on medical necessity. Instead, the cookie-cutter approach to the NCV tests was designed solely to maximize the charges that Defendants could submit to GEICO and other insurers, and to maximize their ill-gotten profits.

(iii) The Fraudulent Charges for EMG Tests

291. EMGs involve insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The electrical activity in each muscle tested is compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

292. Though, in some cases, the EDX Defendants purported to provide EMG tests to Insureds in order to determine whether the Insureds suffered from radiculopathies, the EDX Defendants did not take a proper history or examination of Insureds that would indicate radiculopathy symptoms or signs or any other medical problems arising from any automobile accidents.

293. In actuality, to the extent that the EDX Defendants purported to provide EMG tests to Insureds at all, the tests were provided as part of Defendants' pre-determined, fraudulent treatment protocol designed to maximize the billing that they could submit for each Insured.

294.    There are many different muscles in the arms and legs that can be tested using EMGs. The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is based upon a history and physical examination of each individual patient, as well as the real-time results obtained from the EMGs as they are performed on each specific muscle. As a result, the number of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient-to-patient.

295.    Even so, the EDX Defendants did not tailor the EMG tests they purported to provide and/or perform to the unique circumstances of each patient. Instead, the EDX Defendants routinely tested the same muscles in the same limbs repeatedly, without regard for individual patient presentment.

296.    Furthermore, even if there were any need for any of these EMG tests, the nature and number of the EMG tests that the EDX Defendants purported to provide and/or perform grossly exceed the maximum number of such tests that should have been necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy.

297.    According to the Recommended Policy, the maximum number of EMG tests necessary to diagnose a radiculopathy in 90 percent of all patients is EMG tests of two limbs.

298.    Nonetheless, in the claims for EMG tests identified in Exhibit "1", the EDX Defendants purported to provide and/or perform EMG tests on four limbs, in contravention of the Recommended Policy, solely in order to maximize the fraudulent billing that they could submit to GEICO.

299.    If all other conditions of coverage are satisfied, the Fee Schedule permits lawfully licensed physicians in the metropolitan New York area to submit maximum EMG charges of: (i)

$185.73 under CPT code 95860 if an EMG is performed on at least five muscles of one limb; (ii) $241.50 under CPT code 95861 if an EMG is performed on at least five muscles in each of two limbs; (iii) $314.34 under CPT code 95863 if an EMG is performed on at least five muscles in each of three limbs; and (iv) $408.64 under CPT code 95864 if an EMG is performed on at least five muscles in each of four limbs.

300.    The EDX Defendants frequently purported to perform and/or provide EMG tests on muscles in all four limbs for the Insureds solely to maximize the profits that they could reap from each such Insured.

301.    Further evidence that the EDX tests were fraudulent, medically unnecessary, and were performed pursuant to Defendants' pre-determined fraudulent treatment protocol is the fact that they were performed in violation of the restrictions imposed by the New York State Department of Health Office of Professional Medical Misconduct.

302.    More specifically, Delys St. Hill, M.D., an employee of Smart Choice Medical, was found guilty by OPMC on August 25, 2016, of professional misconduct by having committed negligence on more than one occasion; ordering excessive EMG/NCV tests and treatments which were not warranted by the patient's condition; practicing fraudulently and failing to maintain accurate patient medical records. Dr. Hill's medical license was suspended ninety days and subject to probation for five years.

303.    The probation included being required to use a practice monitor. Specifically, Dr. Hill would only practice medicine when her practice was being monitored by a physician board certified in an appropriate specialty (i.e. neurology or physical medicine and rehabilitation). Dr. Hill's probation was effective December 21, 2016.

304.     Not only was Chumaceiro and Smart Choice not aware of the disciplinary issues plaguing Dr. Hill, upon information and belief, no practice monitor was assigned to Dr. Hill when she performed EDX tests on behalf of Smart Choice Medical after December 21, 2016, as reflected in Exhibit "1".

### 7.     The Fraudulent Charges for LINT/TPII Treatment

305.     As set forth in Exhibit "3", based upon the fraudulent, pre-determined "diagnoses" they purported to provide to virtually every Insured at the conclusion of their putative initial and follow-up examinations, Brownsville Chiropractic and Bucci purported to provide many Insureds with Localized Intense Neurostimulation Therapy and Trigger Point Impedance Imaging ("LINT/TPII Treatment") using something called a Nervomatrix Device.

306.     Bucci and Brownsville Chiropractic (along with the Management Defendants, referred herein as the "LINT/TPII Defendants") purported to perform virtually all of the LINT/TPII Treatments, which then were billed to GEICO under CPT codes 95999 and 99199, virtually always resulting in a charge of $2,455.00 per session.

307.     Like the charges for the other Fraudulent Services, the charges for the LINT/TPII Services were fraudulent in that they misrepresented Brownsville Chiropractic and Bucci's eligibility to collect No-Fault Benefits in the first instance.

308.     In fact, Brownsville Chiropractic and Bucci never were eligible to collect No-Fault Benefits in connection with the claims identified in Exhibit "3", because – as a result of the fraudulent scheme described herein – neither they nor the LINT/TPII Treatments were in compliance with all relevant laws and regulations governing healthcare practice in New York.

309.     What is more, in the claims for LINT/TPII Treatments, the charges for the LINT/TPII Treatments were fraudulent in that the LINT/TPII Treatments were medically useless

and were provided, to the extent that they were provided at all, solely in order to maximize the billing submitted through the LINT/TPII Defendants, not to treat or otherwise benefit the Insureds who purportedly were subjected to them.

(i)    Standard of Care for the Diagnosis and Treatment of Trigger Points

310.    Trigger points are irritable, painful, taut muscle bands or palpable knots in a muscle that can cause localized pain or referred pain that is felt in a part of the body other than that in which the applicable muscle is located. Trigger points can be caused by a variety of factors, including direct muscle injuries sustained in automobile accidents.

311.    In a legitimate clinical setting, trigger points are diagnosed as part of a standard physical examination based upon pain that results when pressure is applied to a specific area of a patient's body.

312.    In a legitimate clinical setting, trigger point treatment should begin with conservative therapies such as bed rest, active exercises, physical therapy, heating or cooling modalities, massage, and basic, non-steroidal, anti-inflammatory analgesic, such as ibuprofen or naproxen sodium.

313.    Should an initial course of conservative therapies fail to remediate trigger points, trigger point injections may be warranted. Trigger point injections typically involve injections of local anesthetic medication into a trigger point. Trigger point injections can relax the area of intense muscle spasm, improve blood flow to the affected area, and thereby permit the washout of irritating metabolites.

(ii)    The Medically Useless LINT/TPII Treatment

314.    LINT/TPII Treatment is a two-step process that purports to both diagnose and treat trigger points. First, the Nervomatrix Device allegedly identifies the most clinically relevant

active trigger points along a person's skin by measuring electrical resistance on the skin surface, which generates a two-dimensional image of skin impedance. Then a moving row of twenty-six miniature probes that touch, but do not penetrate the skin surface, provide electrical pulses to the targeted trigger points. These electrical pulses purportedly stimulate the release of endorphins to alleviate a patient's pain. Typically, LINT/TPII Treatment is administered once per week over the course of six weeks for 30 minutes sessions.

315.    In actuality, however, LINT/TPII Treatment is medically useless for both the diagnosis and the treatment of trigger points.

316.    In keeping with the fact that LINT/TPII Treatment is medically useless for both the diagnosis and the treatment of trigger points, there are no reliable, peer-reviewed data that establish the effectiveness of the Nervomatrix Device and LINT/TPII Treatment. Indeed, studies have found that the Nervomatrix Device does not actually improve a patient's back pain and does not result in a better outcome than a placebo treatment. Notably, the only published data that actually contends that the Nervomatrix Device is effective in diagnosing and treating trigger points was published in 2011 by Dr. Miguel Gorenberg, the founder of a Delaware company that developed and manufactured the Nervomatrix Device – Nervomatrix.

317.    In keeping with the fact that LINT/TPII Treatment is medically useless for both the diagnosis and the treatment of trigger points, Nervomatrix ceased operations in 2018 and was dissolved on February 17, 2019. In addition, the company's website, soleve.com, is no longer operational. Although the Nervomatrix Device had been available in the United States since at least 2014, presently, only twelve known providers, including Brownsville Chiropractic, submit bills to GEICO for LINT/TPII Treatments using the Nervomatrix Device. By way of contrast,

since January 1, 2019, more than nine hundred eighty one (981) different providers have submitted bills to GEICO for trigger point injections.

318.   Indeed, LINT/TPII Treatment and the Nervomatrix Device are so outside the standard of care for the diagnosis and treatment of trigger points that Bucci, a practicing chiropractor for over 20 years, had never heard of LINT/TPII Treatment or the Nervomatrix Device until 2018 when, just as the manufacturer of the Nervomatrix Device was ceasing all operations, Gulkarov, a non-medical professional, out of nowhere, approached him about this "very innovative machine".

319.   Gulkarov introduced Bucci to LINT/TPII Treatment and the Nervomatrix Device, and also, not surprisingly, to Buziashvili, the owner of Innovations Tech.

320.   Without performing any independent investigation into the cost or effectiveness of LINT/TPII Treatment and the Nervomatrix Device, Bucci ultimately rented a Nervomatrix Device from Buziashvili and Innovations Tech for a ridiculous price of $13,000.00 per month. Upon information and belief, Buziashiavili had acquired the Neuromatrix Device for less than $5,000.

321.   In keeping with the fact that that LINT/TPII Treatment is medically useless for both the diagnosis and the treatment of trigger points, (i) the American Medical Association's Physicians' Current Procedural Terminology handbook, which establishes thousands of CPT codes for healthcare providers to use in describing their services for billing purposes, does not recognize a CPT code for LINT/TPII Treatment, and (ii) the putative "results" of the LINT/TPII Treatments purportedly performed by the LINT/TPII Defendants (a) were not incorporated into any Insured's treatment plan; (b) played no legitimate role in the overall treatment or care of the

Insureds; and (c) had minimal, if any, impact on the Insureds' range of motion deficits and level of back pain.

322.   For example:

(i)   Brownsville Chiropractic and Bucci purported to perform a chiropractic re-evaluation of an Insured named CP on June 25, 2018. At the conclusion of the purported re-evaluation, Brownsville Chiro and Bucci reported the following lumbar region range of motion deficits for CP: (i) flexion – 33%; (ii) extension – 20%; (iii) left lateral bending – 20%; and (iv) right lateral bending – 20%. Brownsville Chiro and Bucci also reported that CP complained of 7/10 level back pain and recommended continued chiropractic therapy 3x per week. Thereafter, the LINT/TPII Defendants purported to provide LINT/TPII Treatments to CP's lumbar region on July 2, 2018, July 10, 2018, July 16, 2018, July 24, 2018, July 30, 2018, and August 6, 2018. Toward the end of CP's LINT/TPII Treatment regimen, on July 24, 2018, Brownsville Chiro and Bucci purported to perform another chiropractic re-evaluation of CP. At the conclusion of the July 24, 2018 purported re-evaluation, Brownsville Chiro and Bucci reported the same lumbar region range of motion deficits for CP as they had pre-LINT/TPII Treatments: (i) flexion – 33%; (ii) extension – 20%; (iii) left lateral bending – 20%; and (iv) right lateral bending – 20%. Brownsville Chiro and Bucci also reported that CP's complaint of back pain had decreased only one unit to 6/10 from where it had been pre-LINT/TPII Treatment and Brownsville Chiro and Bucci recommended the same treatment regimen for CP as they had pre-LINT/TPII Treatment: chiropractic therapy 3x per week.

(ii)   Brownsville Chiropractic and Bucci purported to perform a chiropractic re-evaluation of an Insured named DN on June 25, 2018. At the conclusion of the purported re-evaluation, Brownsville Chiro and Bucci reported the following lumbar region range of motion deficits for DN: (i) flexion – 33%; (ii) extension – 20%; (iii) left lateral bending – 20%; and (iv) right lateral bending – 20%. Brownsville Chiro and Bucci also reported that DN complained of 6/10 level back pain and recommended continued chiropractic therapy 3x per week. Thereafter, the LINT/TPII Defendants purported to provide LINT/TPII Treatments to DN's lumbar region on July 11, 2018, July 25, 2018, August 2, 2018, August 15, 2018, September 13, 2018, and September 27, 2018. After the conclusion of DN's LINT/TPII Treatment regimen, on October 10, 2018, Brownsville Chiro and Bucci purported to perform another chiropractic re-evaluation of DN. At the conclusion of the October 10, 2018 re-evaluation, Brownsville Chiro and Bucci reported the same lumbar region range of motion deficits for DN as they had pre-LINT/TPII Treatments: (i) flexion – 33%; (ii) extension – 20%; (iii) left lateral bending – 20%; and (iv) right lateral bending – 20%. Brownsville Chiro and Bucci also reported that DN's complaint of back pain had decreased only one unit to 5/10 from where it had been pre-LINT/TPII Treatment and Brownsville Chiro

and Bucci recommended <u>the same treatment regimen</u> for DN as they had pre-LINT/TPII Treatment: chiropractic therapy 3x per week.

(iii)    Brownsville Chiropractic and Bucci purported to perform a chiropractic re-evaluation of an Insured named CHB on June 25, 2018. At the conclusion of the purported re-evaluation, Brownsville Chiro and Bucci reported the following lumbar region range of motion deficits for CHB: (i) flexion – 33%; (ii) extension – 20%; (iii) left lateral bending – 20%; and (iv) right lateral bending – 20%. Brownsville Chiro and Bucci also reported that CHB complained of 6/10 level back pain and recommended continued chiropractic therapy 3x per week. Thereafter, the LINT/TPII Defendants purported to provide LINT/TPII Treatments to CHB's lumbar region on June 29, 2018, July 11, 2018, July 20, 2018, July 27, 2018, August 3, 2018, and August 10, 2018. Toward the conclusion of CHB's LINT/TPII Treatment regimen, on July 23, 2018, Brownsville Chiro and Bucci purported to perform another chiropractic re-evaluation of CHB. At the conclusion of the July 23, 2018 re-evaluation, Brownsville Chiro and Bucci reported <u>the same lumbar range of motion deficits</u> for CHB as they had pre-LINT/TPII Treatments: (i) flexion – 33%; (ii) extension – 20%; (iii) left lateral bending – 20%; and (iv) right lateral bending – 20%. Brownsville Chiro and Bucci also reported that CHB's complaint of back pain had <u>decreased only one unit</u> to 5/10 from where it had been pre-LINT/TPII Treatment and Brownsville Chiro and Bucci recommended <u>the same treatment regimen</u> for CHB as they had pre-LINT/TPII Treatment: chiropractic therapy 3x per week.

(iv)    Brownsville Chiropractic and Bucci purported to perform a chiropractic re-evaluation of an Insured named CP on June 26, 2018. At the conclusion of the purported re-evaluation, Brownsville Chiro and Bucci reported the following lumbar region range of motion deficits for CP: (i) flexion – 33%; (ii) extension – 20%; (iii) left lateral bending – 20%; and (iv) right lateral bending – 20%. Brownsville Chiro and Bucci also reported that CP complained of 5/10 level back pain and recommended continued chiropractic therapy 3x per week. Thereafter, the LINT/TPII Defendants purported to provide LINT/TPII Treatments to CP's lumbar region on July 20, 2018, August 3, 2018, August 24, 2018, August 28, 2018, October 5, 2018, and October 26, 2018. After the conclusion of CP's LINT/TPII Treatment regimen, on October 26, 2018, Brownsville Chiro and Bucci purported to perform another chiropractic re-evaluation of CP. At the conclusion of the October 26, 2018 re-evaluation, Brownsville Chiro and Bucci reported <u>the same lumbar region range of motion deficits</u> for CP as they had pre-LINT/TPII Treatments: (i) flexion – 33%; (ii) extension – 20%; (iii) left lateral bending – 20%; and (iv) right lateral bending – 20%. Brownsville Chiro and Bucci also reported that CP complained <u>of the same 5/10 level back pain</u> as she had pre-LINT/TPII Treatment and Brownsville Chiro and Bucci recommended <u>the same treatment regimen</u> for CP as they had pre-LINT/TPII Treatment: chiropractic therapy 3x per week.

(v)     Brownsville Chiropractic and Bucci purported to perform a chiropractic re-evaluation of an Insured named KT on June 26, 2018. At the conclusion of the purported re-evaluation, Brownsville Chiro and Bucci reported the following lumbar region range of motion deficits for KT: (i) flexion – 33%; (ii) extension – 20%; (iii) left lateral bending – 20%; and (iv) right lateral bending – 20%. Brownsville Chiro and Bucci also reported that KT complained of 5/10 level back pain and recommended continued chiropractic therapy 3x per week. Thereafter, the LINT/TPII Defendants purported to provide LINT/TPII Treatments to KT's lumbar region on June 27, 2018, July 5, 2018, July 18, 2018, August 1, 2018, August 8, 2018, and August 17, 2018. After the conclusion of KT's LINT/TPII Treatment regimen, on August 30, 2018, Brownsville Chiro and Bucci purported to perform another chiropractic re-evaluation of KT. At the conclusion of the August 30, 2018 re-evaluation, Brownsville Chiro and Bucci reported <u>the same lumbar region range of motion deficits</u> for KT as they had pre-LINT/TPII Treatments: (i) flexion – 33%; (ii) extension – 20%; (iii) left lateral bending – 20%; and (iv) right lateral bending – 20%. Brownsville Chiro and Bucci also reported that KT complained <u>of the same 5/10 level back pain</u> as he had pre-LINT/TPII Treatment and Brownsville Chiro and Bucci recommended <u>the same treatment regimen</u> for KT as they had pre-LINT/TPII Treatment: chiropractic therapy 3x per week.

(vi)    Brownsville Chiropractic and Bucci purported to perform a chiropractic re-evaluation of an Insured named NR on June 27, 2018. At the conclusion of the purported re-evaluation, Brownsville Chiro and Bucci reported the following lumbar region range of motion deficits for NR: (i) flexion – 33%; (ii) extension – 20%; (iii) left lateral bending – 20%; and (iv) right lateral bending – 20%. Brownsville Chiro and Bucci also reported that NR complained of 7/10 level back pain and recommended continued chiropractic therapy 3x per week. Thereafter, the LINT/TPII Defendants purported to provide LINT/TPII Treatments to NR's lumbar region on July 10, 2018, July 23, 2018, July 30, 2018, August 13, 2018, August 21, 2018, and August 27, 2018. After the conclusion of NR's LINT/TPII Treatment regimen, on August 27, 2018, Brownsville Chiro and Bucci purported to perform another chiropractic re-evaluation of NR. At the conclusion of the August 27, 2018 re-evaluation, Brownsville Chiro and Bucci reported <u>the same lumbar region range of motion deficits</u> for NR as they had pre-LINT/TPII Treatments: (i) flexion – 33%; (ii) extension – 20%; (iii) left lateral bending – 20%; and (iv) right lateral bending – 20%. Brownsville Chiro and Bucci also reported that NR's complaint of back pain had <u>decreased only one unit</u> to 6/10 from where it had been pre-LINT/TPII Treatment and Brownsville Chiro and Bucci recommended <u>the same treatment regimen</u> for NR as they had pre-LINT/TPII Treatment: chiropractic therapy 3x per week.

(vii)   Brownsville Chiropractic and Bucci purported to perform a chiropractic re-evaluation of an Insured named LP on August 15, 2018. At the conclusion of the purported re-evaluation, Brownsville Chiro and Bucci reported the following lumbar region range of motion deficits for LP: (i) flexion – 50%; (ii) extension –

40%; (iii) left lateral bending – 20%; and (iv) right lateral bending – 20%. Brownsville Chiro and Bucci also reported that LP complained of 7/10 level back pain and recommended continued chiropractic therapy 3x per week. Thereafter, the LINT/TPII Defendants purported to provide LINT/TPII Treatments to LP's lumbar region on August 23, 2018, August 30, 2018, September 6, 2018, September 14, 2018, and September 20, 2018. Toward the conclusion of LP's LINT/TPII Treatment regimen, on September 18, 2018, Brownsville Chiro and Bucci purported to perform another chiropractic re-evaluation of LP. At the conclusion of the September 18, 2018 re-evaluation, Brownsville Chiro and Bucci reported substantially similar lumbar region range of motion deficits for LP as they had pre-LINT/TPII Treatments: (i) flexion – 44%; (ii) extension – 20%; (iii) left lateral bending – 20%; and (iv) right lateral bending – 20%. Brownsville Chiro and Bucci also reported that LP's complaint of back pain had <u>decreased only one unit</u> to 6/10 from where it had been pre-LINT/TPII Treatment and Brownsville Chiro and Bucci recommended <u>the same treatment regimen</u> for LP as they had pre-LINT/TPII Treatment: chiropractic therapy 3x per week.

(viii)   Brownsville Chiropractic and Bucci purported to perform a chiropractic re-evaluation of an Insured named AR on September 17, 2018. At the conclusion of the purported re-evaluation, Brownsville Chiro and Bucci reported the following lumbar region range of motion deficits for AR: (i) flexion – 33%; (ii) extension – 60%; (iii) left lateral bending – 20%; and (iv) right lateral bending – 20%. Brownsville Chiro and Bucci also reported that AR complained of 6/10 level back pain and recommended continued chiropractic therapy 3x per week. Thereafter, the LINT/TPII Defendants purported to provide LINT/TPII Treatments to AR's lumbar region on September 20, 2018, October 12, 2018, October 17, 2018, November 5, 2018, November 8, 2018, and November 21, 2018. Toward the end of AR's LINT/TPII Treatment regimen, on October 16, 2018, Brownsville Chiro and Bucci purported to perform another chiropractic re-evaluation of AR. At the conclusion of the October 16, 2018 re-evaluation, Brownsville Chiro and Bucci reported the following substantially similar range of motion deficits for AR: (i) flexion – 33%; (ii) extension – 40%; (iii) left lateral bending – 20%; and (iv) right lateral bending – 20%. Brownsville Chiro and Bucci also reported that AR's complaint of back pain had <u>decreased only one unit</u> to 5/10 from where it had been pre-LINT/TPII Treatment and Brownsville Chiro and Bucci recommended <u>the same treatment regimen</u> for AR as they had pre-LINT/TPII Treatment: chiropractic therapy 3x per week.

(ix)   Brownsville Chiropractic and Bucci purported to perform a chiropractic re-evaluation of an Insured named JR on September 27, 2018. At the conclusion of the purported re-evaluation, Brownsville Chiro and Bucci reported the following lumbar region range of motion deficits for JR: (i) flexion – 33%; (ii) extension – 60%; (iii) left lateral bending – 20%; and (iv) right lateral bending – 20%. Brownsville Chiro and Bucci also reported that JR complained of 7/10 level back pain and recommended continued chiropractic therapy 3x per week. Thereafter, the LINT/TPII Defendants purported to provide LINT/TPII Treatments to JR's

lumbar region on October 10, 2018, October 16, 2018, October 25, 2018, October 31, 2018, and November 8, 2018. Toward the conclusion of JR's LINT/TPII Treatment regimen, on October 30, 2018, Brownsville Chiro and Bucci purported to perform another chiropractic re-evaluation of JR. At the conclusion of the October 30, 2018 re-evaluation, Brownsville Chiro and Bucci reported substantially similar lumbar region range of motion deficits for JR as they had pre-LINT/TPII Treatments: (i) flexion – 33%; (ii) extension – 20%; (iii) left lateral bending – 20%; and (iv) right lateral bending – 20%. Brownsville Chiro and Bucci also reported that JR's complaint of back pain had <u>decreased only one unit</u> to 6/10 from where it had been pre-LINT/TPII Treatment and Brownsville Chiro and Bucci recommended <u>the same treatment regimen</u> for JR as they had pre-LINT/TPII Treatment: chiropractic therapy 3x per week.

(x) Brownsville Chiropractic and Bucci purported to perform a chiropractic re-evaluation of an Insured named FP on March 5, 2019. At the conclusion of the purported re-evaluation, Brownsville Chiro and Bucci reported the following thoracic region range of motion deficits for FP: (i) flexion – 0%; (ii) right rotation – 33%; and (iii) left rotation – 33%. Brownsville Chiro and Bucci also reported that FP complained of 5/10 level back pain and continued chiropractic therapy 3x per week. Thereafter, the LINT/TPII Defendants purported to provide LINT/TPII Treatments to FP's thoracic region on March 12, 2019, March 28, 2019, April 23, 2019, May 9, 2019, July 2, 2019, and July 22, 2019. At the conclusion of FP's thoracic LINT/TPII Treatment regimen, on July 22, 2019, Brownsville Chiro and Bucci purported to perform another chiropractic re-evaluation of FP. At the conclusion of the July 22, 2019 re-evaluation, Brownsville Chiro and Bucci reported the exact same range of motion deficits for FP as they had pre-LINT/TPII Treatments: (i) flexion – 0%; (ii) right rotation – 33%; and (iii) left rotation – 33%. Brownsville Chiro and Bucci also reported that JR's complaint of back pain had <u>increased one unit</u> to 6/10 from where it had been pre-LINT/TPII Treatment. Brownsville Chiro and Bucci also recommended <u>the same treatment regimen</u> for FP as they had pre-LINT/TPII Treatment: chiropractic therapy 3x per week.

323. These are only representative examples. In virtually all of the claims for LINT/TPII Treatment identified in Exhibit "3", the putative "results" of the LINT/TPII Treatments purportedly performed by the LINT/TPII Defendants: (i) were not incorporated into any Insured's treatment plan; (ii) played no legitimate role in the overall treatment or care of the Insureds; and (iii) had minimal, if any, impact on the Insureds' range of motion deficits and level of back pain.

324.    Moreover, and in keeping with the fact that LINT/TPII Treatment is medically useless for both the diagnosis and the treatment of trigger points, Bucci and Brownsville Chiropractic falsely reported the Insureds' subjective relief from pain after each LINT/TPII Treatment.

325.    In order to create the false appearance that the LINT/TPII Treatments in fact provided quantifiable pain relief for the Insureds who were subjected to them, the LINT/TPII Defendants frequently purported to record the Insureds' subject percentage relief from baseline pain at the conclusion of each LINT/TPII Treatment session.

326.    In fact, the vast majority of the Insureds whom the LINT/TPII Defendants purported to treat were involved in relatively minor "fender bender" accidents, to the extent that they were involved in any actual accident at all. It is highly improbable that the vast majority of these Insureds would achieve the same exact, or nearly the same exact, amount of subjective pain relief from their baseline pain level after each session of LINT/TPII Treatment regardless of: (i) how much pain they were purportedly suffering initially; (ii) how long after their accidents they began treatment; and (iii) what other "treatments" they were receiving concurrently with the LINT/TPII Treatments.

327.    Even so, in the claims for LINT/TPII Treatment, Bucci and Brownsville Chiropractic reported that a statistically improbable amount of Insureds who were subjected to LINT/TPII Treatments by the LINT/TPII Defendants experienced the exact same, or near exact same, percentage of subjective pain relief at the conclusion of each LINT/TPII session.

328.    For example:

(i)     On April 19, 2018, an Insured named NR was involved in an automobile accident. Three months later, on July 10, 2018, Brownsville Chiro and the LINT/TPII Defendants purportedly performed an initial LINT/TPII Treatment on NR and established a purported baseline level of pain.  Thereafter, Brownsville Chiro and

the LINT/TPII Defendants reported that NR experienced: (i) 5% relief from her baseline pain after her second lumbar LINT/TPII Treatment session on July 23, 2018; (ii) 10% relief from her baseline pain after her third lumbar LINT/TPII Treatment session on July 30, 2018; (iii) 15% relief from her baseline pain after her fourth lumbar LINT/TPII Treatment session on August 13, 2018; (iv) 20% relief from her baseline pain after her fifth lumbar LINT/TPII Treatment session on August 21, 2018; and (v) a 35% relief from baseline pain after her sixth lumbar LINT/TPII Treatment session on August 27, 2018.

(ii)     On May 14, 2018, an Insured named CP was involved in an automobile accident. Nearly two months later, on July 2, 2018, Brownsville Chiro and the LINT/TPII Defendants purportedly performed an initial LINT/TPII Treatment on CP and established a purported baseline level of pain.  Thereafter, Brownsville Chiro and the LINT/TPII Defendants reported that CP experienced: (i) 5% relief from his baseline pain after his second lumbar LINT/TPII Treatment session on July 10, 2018; (ii) 10% relief from his baseline pain after his third lumbar LINT/TPII Treatment session on July 16, 2018; (iii) 15% relief from his baseline pain after his fourth lumbar LINT/TPII Treatment session on July 24, 2018; (iv) 20% relief from his baseline pain after his fifth lumbar LINT/TPII Treatment session on July 30, 2018; and (v) 30% relief from his baseline pain after his sixth lumbar LINT/TPII Treatment session on August 6, 2018.

(iii)    On May 24, 2018, an Insured named KT was involved in an automobile accident. One month later, on June 26, 2018, Brownsville Chiro and the LINT/TPII Defendants purportedly performed an initial LINT/TPII Treatment on KT and established a purported baseline level of pain.  Thereafter, Brownsville Chiro and the LINT/TPII Defendants reported that KT experienced: (i) 5% relief from his baseline pain after his second lumbar LINT/TPII Treatment session on July 5, 2018; (ii) 10% relief from his baseline pain after his third lumbar LINT/TPII Treatment session on July 18, 2018; (iii) 15% relief from his baseline pain after his fourth lumbar LINT/TPII Treatment session on August 1, 2018; (iv) 20% relief from his baseline pain after his fifth lumbar LINT/TPII Treatment session on August 8, 2018; and (v) 30% relief from his baseline pain after his sixth lumbar LINT/TPII Treatment session on August 17, 2018.

(iv)     On June 18, 2018, an Insured named WF was involved in an automobile accident. Six months later, on December 5, 2018, Brownsville Chiro and the LINT/TPII Defendants purportedly performed an initial LINT/TPII Treatment on WF and established a purported baseline level of pain. Thereafter, Brownsville Chiro and the LINT/TPII Defendants reported that WF experienced: (i) 5% relief from baseline pain after his second thoracic LINT/TPII Treatment session on December 12, 2018; and (ii) 10% relief from his baseline pain after his third LINT/TPII Treatment session on January 3, 2019. Thereafter, WF's LINT/TPII Treatment regimen appears to have stopped.

(v)     On July 4, 2018, an Insured named LP was involved in an automobile accident. Four months later, on November 14, 2018, Brownsville Chiro and the LINT/TPII Defendants purportedly performed an initial LINT/TPII Treatment on LP and established a purported baseline level of pain.  Thereafter, Brownsville Chiro and the LINT/TPII Defendants reported that LP experienced: (i) 5% relief from her baseline pain after her second thoracic LINT/TPII Treatment session on November 28, 2018; (ii) 10% relief from her baseline pain after her third thoracic LINT/TPII Treatment session on December 6, 2018; (iii) 15% relief from her baseline pain after her fourth thoracic LINT/TPII Treatment session on December 14, 2018; (iv) 20% relief from her baseline pain after her fifth thoracic LINT/TPII Treatment session on December 21, 2018; and (v) 30% relief from her baseline pain after her sixth thoracic LINT/TPII Treatment session on January 4, 2019.

(vi)    On July 15, 2018, an Insured named AB was involved in an automobile accident. Over a month later, on August 22, 2018, Brownsville Chiro and the LINT/TPII Defendants purportedly performed an initial LINT/TPII Treatment on AB and established a purported baseline level of pain. Thereafter, Brownsville Chiro and the LINT/TPII Defendants reported that AB experienced: (i) 5% relief from his baseline pain after his second lumbar LINT/TPII Treatment session on August 30, 2018; (ii) 10% relief from his baseline pain after his third lumbar LINT/TPII Treatment session on September 7, 2018; (iii) 15% relief from his baseline pain after his fourth lumbar LINT/TPII Treatment session on September 14, 2018; (iv) 20% relief from his baseline pain after his fifth lumbar LINT/TPII Treatment session on September 26, 2018; and (v) 30% relief from his baseline pain after his sixth lumbar LINT/TPII Treatment session on October 18, 2018.

(vii)   On July 28, 2018, an Insured named AA was involved in an automobile accident. Four months later, on December 3, 2018, Brownsville Chiro and the LINT/TPII Defendants purportedly performed an initial LINT/TPII Treatment on AA and established a purported baseline level of pain. Thereafter, Brownsville Chiro and the LINT/TPII Defendants reported that AA experienced:  (i) 5% relief from her baseline pain after her second thoracic LINT/TPII Treatment session on December 11, 2018; (ii) 10% relief from her baseline pain after her third thoracic LINT/TPII Treatment session on December 17, 2018; (iii) 15% relief from her baseline pain after her fourth thoracic LINT/TPII Treatment session on December 26, 2018; (iv) 20% relief from her baseline pain after her fifth thoracic LINT/TPII Treatment session on January 2, 2019; and (v) 30% relief from her baseline pain after her sixth thoracic LINT/TPII Treatment session on January 7, 2019.

(viii)  On August 25, 2018, an Insured named JR was involved in an automobile accident. At an unknown/unrecorded time, Brownsville Chiro and the LINT/TPII Defendants purport to have performed an initial LINT/TPII Treatment on JR and established JR's baseline level of pain. Thereafter, Brownsville Chiro and the LINT/TPII Defendants reported that JR experienced: (i) 5% relief from his baseline pain after his second lumbar LINT/TPII Treatment session on October 10, 2018; (ii) 10% relief from his baseline pain after his third lumbar LINT/TPII

Treatment session on October 16, 2018; (iii) 15% relief from his baseline pain after his fourth lumbar LINT/TPII Treatment session on October 25, 2018; (iv) 20% relief from his baseline pain after his fifth lumbar LINT/TPII Treatment session on October 31, 2018; and (v) 30% relief from his baseline pain after his sixth lumbar LINT/TPII Treatment session on November 8, 2018.

(ix)    On September 18, 2018, an Insured named RC was involved in an automobile accident. At an unknown/unrecorded time, Brownsville Chiro and the LINT/TPII Defendants purport to have performed an initial LINT/TPII Treatment on RC and established RC's baseline level of pain. Thereafter, Brownsville Chiro and the LINT/TPII Defendants reported that RC experienced: (i) 5% relief from his baseline pain after his second lumbar LINT/TPII Treatment session on October 30, 2018; (ii) 10% relief from his baseline pain after his third lumbar LINT/TPII Treatment session on November 13, 2018; (iii) 15% relief from his baseline pain after his fourth lumbar LINT/TPII Treatment session on November 20, 2018; (iv) 20% relief from his baseline pain after his fifth lumbar LINT/TPII Treatment session on November 28, 2018; and (v) 25% relief from his baseline pain after his sixth lumbar LINT/TPII Treatment session on January 11, 2018.

(x)    On September 19, 2018, an Insured named CJ was involved in an automobile accident. At an unknown/unreported time, Brownsville Chiro and the LINT/TPII Defendants purport to have performed an initial LINT/TPII Treatment on CJ and established CJ's baseline level of pain. Thereafter, Brownsville Chiro and the LINT/TPII Defendants reported that CJ experienced:  (i) 5% relief from his baseline pain after his second lumbar LINT/TPII Treatment session on November 5, 2018; (ii) 10% relief from his baseline pain after his third lumbar LINT/TPII Treatment session on November 16, 2018; (iii) 15% relief from his baseline pain after his fourth lumbar LINT/TPII Treatment session on November 26, 2018: (iv) 20% relief from his baseline pain after his fifth lumbar LINT/TPII Treatment session on December 3, 2018; and (v) 25% relief from baseline pain after his sixth lumbar LINT/TPII Treatment session on December 13, 2018.

329.    These are only representative examples. In the claims for LINT/TPII Treatment identified in Exhibit "3", Bucci and Brownsville Chiropractic reported that a statistically improbable amount of Insureds who were subjected to LINT/TPII Treatments by the LINT/TPII Defendants experienced the exact same, or near exact same, percentage of subjective pain relief at the conclusion of each LINT/TPII session.

### 8.   The Fraudulent Acupuncture Treatment

330.   In addition to the other Fraudulent Services that Defendants purported to provide, Defendants purported to subject many Insureds to a series of medically unnecessary acupuncture treatments at the direction of the Management Defendants.

331.   Um, Harmonized Acupuncture, Kuroyama, Sa Qi Acupuncture, Nakamura, and K N Acupuncture (collectively, with the Management Defendants, the "Acupuncture Defendants") purported to subject Insureds to a series of medically unnecessary acupuncture treatments at the Southern Blvd Medical Clinic and the Rockaway Ave Medical Clinic.

332.   Um purported to perform acupuncture services on behalf of Harmonized Acupuncture at the Rockaway Ave Medical Clinic.

333.   Kuroyama purported to perform acupuncture services on behalf of Sa Qi Acupuncture at the Southern Blvd Medical Clinic.

334.   Nakamura purported to perform acupuncture services on behalf of K N Acupuncture at the Southern Blvd Medical Clinic.

335.   Like Defendants' charges for the other Fraudulent Services, the charges for acupuncture were fraudulent in that the acupuncture was medically unnecessary and was performed – to the extent it was performed at all – pursuant to the Management Defendants' directive and Defendants' illegal kickback and runner scheme, not to treat or otherwise benefit the Insureds.

336.   The predetermined, fraudulent protocol was grounded on fabricated exams and reports used to support excessive and medically unnecessary acupuncture services not warranted by the patients' conditions.

(i) <u>Legitimate Acupuncture Practices</u>

337. Acupuncture is predicated upon the theory that there are twelve main meridians ("the Meridians") in the human body through which energy flows. Every individual has a unique energy flow ("Chi"). When an individual's unique Chi becomes disrupted or imbalanced for any reason (such as trauma), needles can be inserted or pressure can be applied to very specific points ("Acupuncture Points") along the Meridians to remove the disruption or imbalance and restore the patient's unique Chi.

338. The goal of any legitimate acupuncture treatment is to effectively treat and benefit the patient by restoring his or her unique Chi, relieving his or her symptoms, and returning him or her to normal activity.

339. The first step in any legitimate acupuncture treatment is a physical examination of the patient. The two most critical components of this examination are the appearance of the patient's tongue (<u>i.e.</u>, color, shape, texture, <u>etc</u>.) and various measurements of the patient's pulse (<u>i.e.</u>, rate, rhythm, strength, <u>etc</u>.). The information gleaned from these elements of the physical examination is necessary to diagnose the patient's condition and thereby develop an acupuncture treatment plan designed to benefit the patient by restoring his unique Chi.  In cases involving trauma, an actual physical examination also is appropriate to identify the location of the injury and consequent pain and – by extension – to identify the Meridians, if any, that have been disrupted.

340. The second step in any legitimate acupuncture treatment is the development of an acupuncture treatment plan. In developing a legitimate treatment plan, an acupuncturist will consider both the injuries sustained by the patient, as well as the tongue and pulse information obtained during the physical examination. Using this information, the acupuncturist will identify

a unique, cohesive, and individualized set of Acupuncture Points into which needles can be inserted or pressure can be applied to restore the patient's Chi and address the patient's discrete injuries.

341.    In developing a legitimate acupuncture treatment plan, an acupuncturist may choose from at least 360 discrete Acupuncture Points. Any legitimate acupuncture treatment plan should include the use of both "local" Acupuncture Points (i.e., points near the affected areas of the relevant Meridian), and "distal" Acupuncture Points (i.e., points that are distant from the affected areas of the relevant Meridian).

342.    The third step in any legitimate acupuncture treatment is the implementation of the acupuncture treatment plan. If performed legitimately, this step typically will involve insertion of between 10 and 20 acupuncture needles into between 5 and 10 Acupuncture Points. Within these parameters, the number and location of the Acupuncture Points generally will vary based upon the unique circumstances presented by each patient as well as each patient's individual therapeutic response to each acupuncture treatment.

343.    Any legitimate acupuncture treatment plan requires a continuous assessment of the patient's condition and energy flow, as well as the therapeutic effect of previous treatments. Acupuncture treatment plans are fluid and evolve over time. Therefore, the goal of any legitimate acupuncture treatment plan is to make appropriate adjustments as treatment progresses in order to improve the therapeutic effectiveness of each treatment, and eventually to return the patient to maximum health by restoring his or her unique energy flow.

344.    Any legitimate acupuncture treatment requires meaningful documentation of the: (i) physical examination; (ii) diagnosis; (iii) treatment plan; (iv) results of each session; and (v) the patient's progress throughout the course of treatment.

(ii)     The Acupuncture Defendants' Fraudulent Examinations

345.     The Acupuncture Defendants purported to begin treatment of Insureds with an initial examination which was billed under CPT codes 99203, typically resulting in a charge of $79.89.

346.     The charges for the initial acupuncture examinations were fraudulent in that the examinations (i) were medically unnecessary; (ii) were performed as part of the fraudulent treatment protocol and illegal financial arrangements between Defendants, and (iii) misrepresented the nature and extent of the initial acupuncture examinations.

347.     Pursuant to the CPT Assistant, which is incorporated by reference into the Fee Schedule, the use of CPT code 99203 to bill for an initial patient examination typically requires that the Insured present with problems of moderate severity.

348.     By contrast, to the limited extent that the Insureds had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were low severity soft tissue injuries such as sprains and strains.

349.     Even so, the Acupuncture Defendants routinely billed for their putative examinations using CPT code 99203, and thereby falsely represented that the Insureds presented with problems of moderate severity, when in fact the Insureds' problems were low-severity soft tissue injuries such as sprains and strains, to the limited extent that they actually had any presenting problems at all.

350.     The Acupuncture Defendants routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations involving presenting problems of low

severity. Defendants also routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for the laundry list of other Fraudulent Services that Defendants purported to provide to the Insureds, including acupuncture services.

351.    Further, the use of CPT code 99203 typically requires that the practitioner spend 30 minutes of face-to-face time with the Insured or the Insured's family.

352.    Though the Acupuncture Defendants typically billed for the initial examinations under CPT code 99203, no acupuncturist associated with the Acupuncture Defendants ever spent 30 minutes of face-to-face time with the Insureds or their families during the initial examinations. Rather, the initial examinations rarely lasted more than 10 minutes, to the extent they were conducted at all.

353.    In keeping with the fact that the initial examinations rarely lasted more than 10 minutes – to the extent they were conducted at all – the Acupuncture Defendants used pre-printed checklist or template forms in conducting the examinations.

354.    The pre-printed checklist and template forms that the Acupuncture Defendants used in conducting the initial examinations set forth a very limited range of potential patient complaints, potential diagnoses, and treatment recommendations.

355.    All that was required to complete the pre-printed checklist and template forms was a cursory patient interview and a cursory physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs and basic range of motion and muscle strength testing. In fact, the examination findings were a simple reiteration of the Insureds' subjective complaints or general descriptions of their injuries. There was no assessment of the Insureds' conditions.

356.     These interviews and examinations did not require any acupuncturists associated with the Acupuncture Defendants to spend more than 10 minutes of face-to-face time with the Insureds during the putative initial examinations.

357.     Further, the purported examinations provided by the Acupuncture Defendants did not remotely comport with any of the basic, legitimate acupuncture requirements.  For example, the examinations:

> (i)      failed to include palpation findings as there was no specific areas of tenderness or pain, and/or specific muscle spasms detailed;

> (ii)     failed to include visual examination findings such as gait changes, antalgic lean, and/or postural distortions;

> (iii)    had no assessment of range of motion or impairment of activities of daily living detailed;

> (iv)    failed to include the specific location of the injuries; and

> (v)     failed to document specific channels or Acupuncture Points.

358.     No objective clinical findings were documented, therefore, the examinations were not medically necessary.  Indeed, they were designed solely to enrich the Acupuncture Defendants.

> (iii)     The Acupuncture Defendants' Fraudulent Acupuncture Treatments

359.     Following the fraudulent initial examinations, the Acupuncture Defendants purported to provide acupuncture treatments that were billed to GEICO under CPT codes 97810 and 97811, typically resulting in charges of $30.00 and $25.69, respectively, for each treatment segment.  Harmonized Acupuncture also billed GEICO under CPT Code 97813, typically resulting in a charge of $79.89 for each treatment segment.

360.     The purported "acupuncture" services provided by the Acupuncture Defendants did not remotely comport with any of the aforesaid basic, legitimate acupuncture requirements.

Instead, at best, they consisted of inserting needles into Insureds in an assembly-line fashion that bore little, if any, relation to the Insured's condition and was not designed to effectively treat or otherwise benefit the Insureds. As such, these acupuncture treatments were not medically necessary. Indeed, they were designed solely to enrich the Acupuncture Defendants through the submission of fraudulent charges to GEICO and other insurers.

361.   For instance:

(i)   needles were inserted into a small range of common and repetitive Acupuncture Points that were clinically useless, often bore no relation to the diagnosed condition, and appeared to have been pre-determined solely for the sake of expediency;

(ii)   there was a very high frequency of treatment sessions that were not supported by the alleged injuries and were not adjusted to reflect the Insureds' improvement or lack thereof;

(iii)   in many cases, injuries noted in the initial acupuncture physical examination reports were not addressed or treated in any manner;

(iv)   in many cases, there was billing for the treatment of injuries when those injuries never actually were treated. For example, the same treatment points were repeated without change or adjustment and patients with different injuries purportedly received the same treatments; and

(v)   generally, the treatments rendered were inadequate, did not follow the treatment plans established by the initial examinations, if any, and were not intended to actually address the Insureds' injuries.

362.   The services billed by the Acupuncture Defendants also reflected a lack of independent professional acupuncture judgment and instead reflected a predetermined protocol designed to enrich Defendants through the submission of charges to GEICO.

363.   Furthermore, the documentation of the purported acupuncture treatments rendered under the names of the Acupuncture Defendants demonstrates that no genuine effort was made to treat the patients' actual injuries, to properly assess their condition, to track their improvement or lack of improvement, or to adjust the treatment to reflect the patients' improvement or lack of

improvement. The documentation of the treatment further demonstrates that, to a significant extent, it is used as nothing more than a sham to support a predetermined and fraudulent treatment protocol.

364.    The Acupuncture Defendants' cookie-cutter treatment protocol is further established by the Acupuncture Defendants routinely billing the same number of units of acupuncture per treatment date per patient, purportedly consisting of up to 45 minutes of personal, one-on-one contact at the Southern Blvd Medical Clinic and the Rockaway Ave Medical Clinic.

365.    The Fee Schedule sets forth the billing codes and requirements for billing acupuncture services to insurers, as follows:

| CPT Code | Description |
|----------|-------------|
| 97810 | Acupuncture, 1 or more needles; without electrical stimulation, initial 15 minutes of personal one-on-one contact with the patient |
| 97811 | Acupuncture, one or more needles, without electrical stimulation, each additional  15 minutes of personal one-on-one contact with the patient, with re-insertion of needle(s)(List separately in addition to code for primary procedure) |
| 97813 | with electrical stimulation, initial 15 minutes of personal one-on-one contact with the patient |

366.    The purported acupuncture treatment described in the Acupuncture Defendants' treatment notes in almost all cases fails to justify the billing submitted for multiple units of personal, one-on-one contact, along with re-insertion, for multiple units of treatment.

367.    Defendants' fraudulent billing scheme misrepresented and exaggerated the level of services provided in order to inflate the charges submitted to GEICO. Specifically, the Acupuncture Defendants uniformly submitted billing to GEICO for multiple segments of purported one-on-one contact rendered on the same day for each Insured, notwithstanding the

fact that the "treatments" allegedly rendered by the Acupuncture Defendants were (or could have been) rendered in one treatment segment.

368.    The Acupuncture Defendants further fraudulently inflated their billing by charging for an "adjunct" acupuncture procedure, known as cupping. Cupping is at best an intermittent treatment, since the act of cupping dredges up stagnant blood and leaves bruises in the application area. Once stagnant blood has been moved, additional cupping is unnecessary – yet the Acupuncture Defendants billed for cupping very frequently, without any evidence of effectiveness.

369.    The Acupuncture Defendants' cookie-cutter approach to the acupuncture "treatments" that they performed, or caused to be performed, on Insureds clearly was not based on medical necessity. Instead, the Acupuncture Defendants' cookie-cutter approach to the acupuncture "treatments" was designed solely to maximize the charges that Defendants could submit to GEICO and other insurers, and to maximize their ill-gotten profits.

**9.      The Fraudulent Chiropractic Treatment**

370.    In addition to the other Fraudulent Services that Defendants purport to provide, Bucci, Brownsville Chiropractic, Quiroga, and Southern Blvd Chiropractic (collectively with the Management Defendants, the "Chiropractic Defendants") routinely purported to subject Insureds to chiropractic at the Southern Blvd Medical Clinic and the Rockaway Ave Medical Clinic.

371.    The charges for chiropractic treatments were fraudulent in that the services were unnecessary and performed as part and parcel of Defendants' fraudulent treatment and billing protocol and the Management Defendants' directive.

372.    Quiroga and Southern Blvd Chiropractic purported to provide Insureds to a series of medically unnecessary chiropractic treatments at the Southern Blvd Medical Clinic.

373.     Bucci and Brownsville Chiropractic purported to provide Insureds to a series of medically unnecessary chiropractic treatments at the Rockaway Ave Medical Clinic.

(i)     The Chiropractic Initial and Follow-Up Examinations

374.     In addition to the initial and follow-up examinations conducted by Chumaceiro and Smart Choice Medical, the Chiropractic Defendants purported to subject Insureds to one or more initial and follow-up chiropractic examinations.

375.     The Chiropractic Defendants' initial examinations were routinely billed under CPT code 99203, typically resulting in a charge of $54.74. The follow-up examinations were routinely billed under code 99212, typically resulting in a charge of $26.41.

376.     The Chiropractic Defendants' charges for the initial examinations misrepresented the extent of the services.

377.     Specifically, the use of CPT code 99203 represents that the practitioner typically spend 30 minutes of face-to-face time with the Insured or the Insured's family.

378.     Though the Chiropractic Defendants routinely billed for the initial examinations under CPT code 99203, the chiropractors associated with the Chiropractor Defendants rarely, if ever, spent 30 minutes of face-to-face time with the Insureds or their families during the initial examinations. Rather, the initial examinations rarely lasted more than 10 minutes, to the extent they were conducted at all.

379.     To the extent that the chiropractic examinations were conducted in the first instance, the Chiropractic Defendants provided a pre-determined laundry-list of phony "diagnoses" for every Insured, and prescribed virtually identical courses of treatment.

380.    In addition, the diagnoses and treatment plans bore no actual relationship to the conditions actually presented, but were simply recited as a matter of course in order to justify the performance of the chiropractic services.

(ii)    The Chiropractic Treatment

381.    Like the charges for the other Fraudulent Services, the chiropractic treatment was performed by the Chiropractic Defendants – to the extent that it was performed at all – pursuant to the Management Defendants' directive and Defendants' illegal kickback and runner scheme, not to treat or otherwise benefit the Insureds.

382.    Pursuant to Defendants' fraudulent pre-determined treatment and billing protocol, Chumaceiro or other medical professionals associated with Smart Choice Medical routinely referred patients to the Chiropractic Defendants for chiropractic services.

383.    Initially, the Chiropractic Defendants diagnosed Insureds with sprains and strains and invariably concluded that Insureds required a treatment plan that included chiropractic adjustments of multiple regions several times per week, typically on the same day they received multiple physical therapy modalities, and often on the same day they received acupuncture, generally resulting in thousands of dollars of charges for each Insured.

384.    The Chiropractic Defendants purported to provide this identical chiropractic treatment plan to virtually every Insured, regardless of the Insureds' individual circumstances or unique presentment, to submit as much billing as possible for chiropractic services, without regard for medical necessity.

385.    Based on the nature of the minor accidents, it is highly unlikely that nearly all of the Insureds who presented to the Chiropractic Defendants at the Southern Blvd Medical Clinic

and at the Rockaway Ave Medical Clinic for treatment suffered injuries as the result of the accidents they purportedly experienced which required extended chiropractic services.

386.    Nonetheless, following the initial examinations and follow-up examinations, Insureds were prescribed and given a medically unnecessary, extended course of chiropractic services. In fact, the Chiropractic Defendants purported to provide Insureds with weeks or months of chiropractic services, including chiropractic manipulation treatments that were billed under CPT code 98941 (3-4 regions) and myofascial release or trigger point therapy services that were billed under CPT code 97139.

387.    The purported results of Defendants' other Fraudulent Services (i.e., examinations, ROM/MT, OAT, and PPT tests) were used by Defendants as continued justification for the rounds of chiropractic treatments, despite the fact the Chiropractic Defendants did not incorporate the "findings" of the other Defendants or the results of the other Fraudulent Services into the chiropractic treatment, nor was there ever any assessment or modification of the chiropractic treatment. For example:

(i)     no details were provided to distinguish which vertebral levels were treated or the length or duration of the adjunctive therapies that were applied;

(ii)    there was no evidence that the purported muscle spasm/hypertonicity and range of motion restrictions were specifically documented for each patient;

(iii)   the treatment/progress notes provided no specifics as to how or where chiropractic manipulations and/or myofascial release/trigger point therapy were applied; and

(iv)    no ongoing assessment of the patient's condition or their progress was documented.

388.    The weeks or months of continued, unchanging chiropractic treatments that were performed on virtually every Insured were not based on medical necessity and not intended to

resolve the complaints/symptoms of the Insureds. Instead, the "protocol" approach to the performance of chiropractic treatments was designed solely to maximize the charges that Defendants could submit to GEICO, and other automobile insurers, and to maximize the revenues that could be generated from each Insured who was subjected to the protocol.

### 10.     The Fraudulent Charges for Physical Therapy Treatment

389.    As part of Defendants' fraudulent treatment protocol, Chumaceiro and Smart Choice Medical (along with the Management Defendants, the "PT Defendants") purported to subject many Insureds to a series of physical therapy treatments at the Southern Blvd Medical Clinic and Rockaway Ave Medical Clinic.

390.    Like Defendants' charges for the other Fraudulent Services, the charges for physical therapy treatment were fraudulent in that the physical therapy treatment was performed – to the extent that it was performed at all – pursuant to illegal kickbacks and the fraudulent treatment protocol established by Defendants.

391.    The charges for the physical therapy that allegedly was provided by the PT Defendants and billed to GEICO through Smart Choice Medical also misrepresented the PT Defendants' eligibility to bill for or to collect No-Fault Benefits in the first instance.

392.    In most cases, the PT Defendants purported to subject each Insured to dozens of physical therapy treatments over an extended period of time, generally resulting in thousands of dollars of charges for each Insured.

393.    In most cases, the Insureds did not go to the hospital at all following their putative accidents and, to the extent that they did visit a hospital or other legitimate healthcare provider after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after an hour or two.

394.    Nonetheless, pursuant to Defendants' fraudulent treatment and billing protocol, following their initial examination/consultations and follow-up examinations, virtually every Insured was prescribed a medically unnecessary, extended course of physical therapy.

395.    The PT Defendants' charges for the physical therapy were predicated on the boilerplate "diagnoses" they provided to the Insureds following the initial and follow-up examinations, as well as the medically useless diagnostic tests.

396.    But for these contrived "diagnoses" and diagnostic tests, the PT Defendants would not have been able to submit charges for the physical therapy because they would have no way to justify the performance of the physical therapy.

(i)    The Unlawful Manipulation of the Fee Schedule For Physical Therapy

397.    In addition, the PT Defendants improperly billed GEICO by circumventing the 8 allowable units for physical therapy per day under the Fee Schedule. For example, Smart Choice Medical provided and billed for physical therapy treatment rendered to Insureds on the same day that physical therapy was performed by and billed through either Southern Blvd Chiropractic or Brownsville Chiropractic for those same Insureds.

398.    The Physical Medicine section of the Fee Schedule establishes ground rules that healthcare providers and insurers are required to follow when determining the permissible charge or reimbursement for a specific service. As it relates to physical therapy services and the scope of services relevant to the present dispute, Ground Rule 11 states:

When multiple physical medicine procedures and/or modalities are performed on the same day, reimbursement is limited to 8.0 units or the amount billed, whichever is less. The following codes represent the physical medicine procedures and modalities subject to this rule:

| 97010 | 97012 | 97014 | 97016 | 97018 | 97022 |
| 97024 | 97026 | 97028 | 97032 | 97033 | 97034 |
| 97035 | 97036 | 97039 | 97110 | 97112 | 97113 |
| 97116 | 97124 | 97139 | 97140 | 97150 | 97530 |
| 97535 | 97537 | 97542 | 97760 | 97661 | 97662 |

399.    Pursuant to the Fee Schedule, the majority of the above referenced CPT codes and corresponding physical procedures are assigned a relative value unit. Therefore, a healthcare provider that provides physical therapy to an Insured cannot bill for and receive payment for any combination of the above referenced physical therapy procedures performed on the same patient on the same day if the aggregate value of all of those procedures exceeds 8.0 units.

400.    In order to effectuate this scheme, Smart Choice Medical rendered basic physical therapy services to Insureds on the one hand while on the other hand, Southern Blvd Chiropractic or Brownsville Chiropractic rendered another form of physical therapy to the same Insureds on the same day. Despite the appearance of separate professional corporations providing services to the Insureds on the same day, the billing for those services was split among professional corporations to circumvent the limitations on the billing for physical therapy services.

401.    For example, Smart Choice Medical performed physical therapy to its patients utilizing CPT Codes 97124 (massage therapy), 97014 (electrical stimulation), and 97010 (hot/cold packs) - which have a cumulative relative value based on the Fee Schedule of 7.65.

402.    Nevertheless, Southern Blvd Chiropractic or Brownsville Chiropractic also rendered physical therapy treatment to the same patients on the same day and billed GEICO utilizing CPT Code 97139 (unlisted therapeutic procedure with a relative value of 2.89).

403.    Thus, at minimum, the cumulative relative value of the physical therapy rendered by Smart Choice Medical (7.65) and physical therapy treatment rendered by Southern Blvd Chiropractic or Brownsville Chiropractic (2.89) per day per patient was 10.54, consequently allowing these professional corporations to obtain additional monies above and beyond the 8.0 allowable units of physical therapy they would be entitled to for each patient per day.

404.    Smart Choice Medical, Southern Blvd Chiropractic, and Brownsville Chiropractic submitted their bills separately in an effort to confuse GEICO into issuing reimbursement despite the fact that one of the modalities of treatment is technically beyond the maximum daily allowable reimbursement.

**D.    The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO**

405.    To support their fraudulent charges, Defendants systematically submitted or caused to be submitted thousands of charges (i.e., bills, NF-3 forms, HCFA-1500 forms) and/or treatment reports through the Provider Defendants to GEICO seeking payment for the Fraudulent Services for which Defendants were not entitled to receive payment.

406.    The bills and treatment reports submitted to GEICO by and on behalf of Defendants were false and misleading in the following material respects:

(i)     The bills and treatment reports uniformly misrepresented to GEICO that the Provider Defendants were lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Provider Defendants were not properly licensed in that they were professional corporations that were fraudulently incorporated and/or unlawfully owned and controlled by the Management Defendants, and which illegally split fees with unlicensed individuals.

(ii)    The bills and treatment reports submitted by and on behalf of Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and rendered in accordance with the exercise of legitimate medical judgment by licensed professionals. In fact, the

Fraudulent Services were not medically necessary and were performed pursuant to predetermined fraudulent protocols controlled by laypersons and designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

(iii)   The bills and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

(iv)   The bills and treatment reports submitted by and on behalf of Defendants uniformly misrepresented to GEICO that the Provider Defendants were in compliance with all material licensing laws and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Provider Defendants were not in compliance with all material licensing laws in that they paid illegal kickbacks for patient referrals.

III.   **Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

407.   Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

408.   To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

409.   In fact, Defendants billed for the Fraudulent Services at the Southern Blvd Medical Clinic and at the Rockaway Ave Medical Clinic through multiple individuals and entities using multiple tax identification numbers in order to reduce the amount of billing submitted through any single entity or under any single tax identification number, thereby preventing GEICO from identifying the fraudulent scheme at the Southern Blvd Medical Clinic and at the Rockaway Ave Medical Clinic and the pattern of fraudulent charges submitted through any one entity.

410.   Specifically, Defendants knowingly misrepresented and concealed facts related to the Provider Defendants in an effort to prevent discovery that the Provider Defendants were

fraudulently incorporated and/or unlawfully controlled and that the Provider Defendants unlawfully split fees with unlicensed persons.

411.    The Defendants also knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Provider Defendants derived their patient base from illegal financial and referral relationships.

412.    Additionally, Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal the fact that the Provider Defendants were fraudulently licensed, unlawfully split fees with unlicensed persons, and unlawfully paid kickbacks for patient referrals.

413.    Furthermore, Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed pursuant to fraudulent predetermined protocols controlled by laypersons and designed to maximize the charges that could be submitted rather than to benefit the Insureds who supposedly were subjected to them.

414.    GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

415.    In accordance with the No-Fault Laws, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through the Defendants; or (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through the defendants (yet GEICO failed to obtain compliance with the

requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

416.    Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

417.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days.

418.    The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them.

419.    As a result, GEICO incurred damages of more than $920,000.00 based upon the fraudulent charges.

420.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

<u>**FIRST CAUSE OF ACTION**</u>
**Against the Provider Defendants**
**(Declaratory Judgment – 28 U.S.C. §§2201 and 2202)**

421.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

422.    There is an actual case in controversy between GEICO and the Provider Defendants regarding more than $2,500,000.00 in unpaid billing for the Fraudulent Services that has been submitted to GEICO through the Provider Defendants.

423.    The Provider Defendants have no right to receive payment from GEICO on the unpaid billing because the Provider Defendants were fraudulently incorporated, and/or secretly and unlawfully owned and controlled by unlicensed individuals and entities.

424.    The Provider Defendants have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and were provided pursuant to predetermined fraudulent protocols controlled by laypersons and designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

425.    The Provider Defendants have no right to receive payment from GEICO on the unpaid billing because the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted through the Provider Defendants to GEICO.

426.    The Provider Defendants have no right to receive payment from GEICO on the unpaid billing because the Provider Defendants unlawfully split fees and/or engaged in unlawful kickback arrangements with unlicensed individuals and entities and, therefore, were ineligible to bill for or to collect No-Fault Benefits.

427.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO through the Provider Defendants.

## SECOND CAUSE OF ACTION
### Against Chumaceiro and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

428.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

429.    Smart Choice Medical is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

430.    Chumaceiro and the Management Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of Smart Choice Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Smart Choice Medical was not eligible to receive under the New York no-fault insurance law because: (i) it was unlawfully licensed, owned and/or controlled by unlicensed laypersons; (ii) it engaged in fee-splitting with unlicensed laypersons and paid illegal kickbacks for patient referrals; (iii) the billed-for-services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Defendants; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

431.    Smart Choice Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Chumaceiro and the Management Defendants operated Smart Choice Medical, insofar as Smart Choice Medical is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Smart Choice Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate

acts of mail fraud implies a continued threat of criminal activity, as does the fact that Chumaceiro and the Management Defendants continue to attempt to collect on the fraudulent billing submitted through Smart Choice Medical to the present day.

432.    Smart Choice Medical is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently owned and/or controlled by non-physicians, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. Smart Choice Medical likewise is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Smart Choice Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

433.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $362,000.00 pursuant to the fraudulent bills submitted through Smart Choice Medical.

434.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Chumaceiro and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

435.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

436. Smart Choice Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

437. Chumaceiro and the Management Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Smart Choice Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Smart Choice Medical was not entitled to receive under the New York no-fault laws because: (i) it was unlawfully licensed, owned and/or controlled by unlicensed laypersons; (ii) it engaged in fee-splitting with unlicensed laypersons and paid illegal kickbacks for patient referrals; (iii) the billed-for-services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Defendants; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

438. Chumaceiro and the Management Defendants knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

439.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $362,000.00 pursuant to the fraudulent bills submitted through Smart Choice Medical.

440.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION
**Against Smart Choice Medical, Chumaceiro, and the Management Defendants**
**(Common Law Fraud)**

441.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

442.    Smart Choice Medical, Chumaceiro, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

443.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Smart Choice Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and/or actually owned and controlled by non-medical professionals; (ii) in every claim, the representation that Smart Choice Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR  § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting and kickback arrangements with non-medical professionals; and (iii) in every claim, the

representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich Defendants.

444.    Smart Choice Medical, Chumaceiro, and the Management Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Smart Choice Medical that were not compensable under New York no-fault insurance laws.

445.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $362,000.00 pursuant to the fraudulent bills submitted by Defendants through Smart Choice Medical.

446.    Smart Choice Medical, Chumaceiro, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

447.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against Smart Choice Medical, Chumaceiro, and the Management Defendants**
**(Unjust Enrichment)**

448.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

449.    As set forth above, Smart Choice Medical, Chumaceiro, and the Management Defendants engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

450.    When GEICO paid the bills and charges submitted by or on behalf of Smart Choice Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Smart Choice Medical, Chumaceiro, and the Management Defendants' improper, unlawful, and/or unjust acts.

451.    Smart Choice Medical, Chumaceiro, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

452.    Smart Choice Medical, Chumaceiro, and the Management Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

453.    By reason of the above, Smart Choice Medical, Chumaceiro, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $362,000.00.

## SIXTH CAUSE OF ACTION
### Against Quiroga and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

454.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

455.    Southern Blvd Chiropractic is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

456.    Quiroga and the Management Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of Southern Blvd Chiro's affairs through a

pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Southern Blvd Chiropractic was not eligible to receive under the New York no-fault insurance law because: (i) it was unlawfully licensed, owned and/or controlled by unlicensed laypersons; (ii) it engaged in fee-splitting with unlicensed laypersons and paid illegal kickbacks for patient referrals; (iii) the billed-for-services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Defendants; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

457.    Southern Blvd Chiro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Quiroga and the Management Defendants operated Southern Blvd Chiropractic, insofar as Southern Blvd Chiropractic is not engaged in a legitimate chiropractic practice, and acts of mail fraud therefore are essential in order for Southern Blvd Chiropractic to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Quiroga and the Management Defendants continue to attempt to collect on the fraudulent billing submitted through Southern Blvd Chiropractic to the present day.

458.     Southern Blvd Chiropractic is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently owned and/or controlled by non-physicians, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. Southern Blvd Chiropractic likewise is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Southern Blvd Chiropractic in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

459.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $113,000.00 pursuant to the fraudulent bills submitted through Southern Blvd Chiro.

460.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**SEVENTH CAUSE OF ACTION**
**Against Quiroga and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

461.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

462.     Southern Blvd Chiropractic is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

463.     Quiroga and the Management Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Southern Blvd

Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Southern Blvd Chiropractic was not entitled to receive under the New York no-fault laws because: (i) it was unlawfully licensed, owned and/or controlled by unlicensed laypersons; (ii) it engaged in fee-splitting with unlicensed laypersons and paid illegal kickbacks for patient referrals; (iii) the billed-for-services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Defendants; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

464.    Quiroga and the Management Defendants knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

465.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $113,000.00 pursuant to the fraudulent bills submitted through Southern Blvd Chiro.

466.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION
### Against Southern Blvd Chiropractic, Quiroga, and the Management Defendants
### (Common Law Fraud)

467.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

468.    Southern Blvd Chiropractic, Quiroga, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

469.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Southern Blvd Chiropractic was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and/or actually owned and controlled by non-medical professionals; (ii) in every claim, the representation that Southern Blvd Chiropractic was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR  § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting and kickback arrangements with non-medical professionals; and (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich Defendants.

470.    Southern Blvd Chiropractic, Quiroga, and the Management Defendants intentionally made the above–described false and fraudulent statements and concealed material

facts in a calculated effort to induce GEICO to pay charges submitted through Southern Blvd Chiropractic that were not compensable under New York no-fault insurance laws.

471.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $113,000.00 pursuant to the fraudulent bills submitted by Defendants through Southern Blvd Chiro.

472.    Southern Blvd Chiropractic, Quiroga, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

473.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION
### Against Southern Blvd Chiropractic, Quiroga, and the Management Defendants
### (Unjust Enrichment)

474.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

475.    As set forth above, Southern Blvd Chiropractic, Quiroga, and the Management Defendants engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

476.    When GEICO paid the bills and charges submitted by or on behalf of Southern Blvd Chiropractic for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Southern Blvd Chiropractic, Quiroga, and the Management Defendants' improper, unlawful, and/or unjust acts.

477.     Southern Blvd Chiropractic, Quiroga, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

478.     Southern Blvd Chiropractic, Quiroga, and the Management Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

479.     By reason of the above, Southern Blvd Chiropractic, Quiroga, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $113,000.00.

**TENTH CAUSE OF ACTION**
**Against Bucci and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

480.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

481.     Brownsville Chiropractic is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

482.     Bucci and the Management Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of Brownsville Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Brownsville Chiropractic was not eligible to receive under the New York no-fault insurance law because: (i) it was unlawfully licensed, owned and/or controlled by unlicensed laypersons; (ii) it engaged in fee-splitting with unlicensed laypersons and paid illegal kickbacks for patient referrals; (iii) the billed-for-services were not medically necessary and were performed pursuant

to a pre-determined, fraudulent protocol designed solely to enrich Defendants; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

483.     Brownsville Chiro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Bucci and the Management Defendants operated Brownsville Chiropractic, insofar as Brownsville Chiropractic is not engaged in a legitimate chiropractic practice, and acts of mail fraud therefore are essential in order for Brownsville Chiropractic to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Bucci and the Management Defendants continue to submit and attempt to collect on the fraudulent billing submitted through Brownsville Chiropractic to the present day.

484.     Brownsville Chiropractic is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently owned and/or controlled by non-physicians, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. Brownsville Chiropractic likewise is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Brownsville Chiropractic

in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

485.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $171,000.00 pursuant to the fraudulent bills submitted through Brownsville Chiro.

486.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## ELEVENTH CAUSE OF ACTION
### Against Bucci and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

487.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

488.    Brownsville Chiropractic is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

489.    Bucci and the Management Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Brownsville Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis over two years seeking payments that Brownsville Chiropractic was not entitled to receive under the New York no-fault laws because: (i) it was unlawfully licensed, owned and/or controlled by unlicensed laypersons; (ii) it engaged in fee-splitting with unlicensed laypersons and paid illegal kickbacks for patient referrals; (iii) the billed-for-services were not medically necessary and were

performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Defendants; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

490.    Bucci and the Management Defendants knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

491.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $171,000.00 pursuant to the fraudulent bills submitted through Brownsville Chiro.

492.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### TWELFTH CAUSE OF ACTION
**Against Brownsville Chiropractic, Bucci, and the Management Defendants**
**(Common Law Fraud)**

493.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

494.    Brownsville Chiropractic, Bucci, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed

material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

495.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Brownsville Chiropractic was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and/or actually owned and controlled by non-medical professionals; (ii) in every claim, the representation that Brownsville Chiropractic was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR  § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting and kickback arrangements with non-medical professionals; and (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich Defendants.

496.    Brownsville Chiropractic, Bucci, and the Management Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Brownsville Chiropractic that were not compensable under New York no-fault insurance laws.

497.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $171,000.00 pursuant to the fraudulent bills submitted by Defendants through Brownsville Blvd Chiro.

498.    Brownsville Chiropractic, Bucci, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

499.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THIRTEENTH CAUSE OF ACTION
**Against Brownsville Chiropractic, Bucci, and the Management Defendants**
**(Unjust Enrichment)**

500.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

501.    As set forth above, Brownsville Chiropractic, Bucci, and the Management Defendants engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

502.    When GEICO paid the bills and charges submitted by or on behalf of Brownsville Chiropractic for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Brownsville Chiropractic, Bucci, and the Management Defendants' improper, unlawful, and/or unjust acts.

503.    Brownsville Chiropractic, Bucci, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

504.    Brownsville Chiropractic, Bucci, and the Management Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

505.     By reason of the above, Brownsville Chiropractic, Bucci, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $171,000.00.

### FOURTEENTH CAUSE OF ACTION
**Against Um and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

506.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

507.     Harmonized Acupuncture is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

508.     Um and the Management Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of Harmonized Acupuncture's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis since its inception seeking payments that Harmonized Acupuncture was not eligible to receive under the New York no-fault insurance law because: (i) it was unlawfully licensed, owned and/or controlled by unlicensed laypersons; (ii) it engaged in fee-splitting with unlicensed laypersons and paid illegal kickbacks for patient referrals; (iii) the billed-for-services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Defendants; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. The fraudulent charges and corresponding mailings submitted to GEICO that

comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

509.    Harmonized Acupuncture's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Um and the Management Defendants operated Harmonized Acupuncture, insofar as Harmonized Acupuncture is not engaged in a legitimate acupuncture practice, and acts of mail fraud therefore are essential in order for Harmonized Acupuncture to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Um and the Management Defendants continue to attempt to collect on the fraudulent billing submitted through Harmonized Acupuncture to the present day.

510.    Harmonized Acupuncture is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently owned and/or controlled by non-physicians, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. Harmonized Acupuncture likewise is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Harmonized Acupuncture in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

511.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $71,000.00 pursuant to the fraudulent bills submitted through Harmonized Acupuncture.

512.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### FIFTEENTH CAUSE OF ACTION
**Against Um and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

513.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

514.     Harmonized Acupuncture is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

515.     Um and the Management Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Harmonized Acupuncture's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis since its inception seeking payments that Harmonized Acupuncture was not entitled to receive under the New York no-fault laws because: (i) it was unlawfully licensed, owned and/or controlled by unlicensed laypersons; (ii) it engaged in fee-splitting with unlicensed laypersons and paid illegal kickbacks for patient referrals; (iii) the billed-for-services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Defendants; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this

116

Complaint are described, in part, in the chart annexed hereto as Exhibit "4". Each such mailing

was made in furtherance of the mail fraud scheme.

516.    Um and the Management Defendants knew of, agreed to and acted in furtherance

of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by

submitting or facilitating the submission of the fraudulent charges to GEICO.

517.    GEICO has been injured in its business and property by reason of the above-

described conduct in that it has paid at least $71,000.00 pursuant to the fraudulent bills submitted

through Harmonized Acupuncture.

518.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable

attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and

proper.

**SIXTEENTH CAUSE OF ACTION**
**Against Harmonized Acupuncture, Um, and the Management Defendants**
**(Common Law Fraud)**

519.    GEICO incorporates, as though fully set forth herein, each and every allegation in

paragraphs set forth above.

520.    Harmonized Acupuncture, Um, and the Management Defendants intentionally

and knowingly made false and fraudulent statements of material fact to GEICO and concealed

material facts from GEICO in the course of their submission of thousands of fraudulent charges

seeking payment for the Fraudulent Services.

521.    The false and fraudulent statements of material fact and acts of fraudulent

concealment include: (i) in every claim, the representation that Harmonized Acupuncture was

properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law

§ 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated

and/or actually owned and controlled by non-medical professionals; (ii) in every claim, the representation that Harmonized Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting and kickback arrangements with non-medical professionals; and (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich Defendants.

522.    Harmonized Acupuncture, Um, and the Management Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Harmonized Acupuncture that were not compensable under New York no-fault insurance laws.

523.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $71,000.00 pursuant to the fraudulent bills submitted by Defendants through Harmonized Acupuncture.

524.    Harmonized Acupuncture, Um, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

525.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SEVENTEENTH CAUSE OF ACTION
### Against Harmonized Acupuncture, Um, and the Management Defendants
### (Unjust Enrichment)

526.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

527.   As set forth above, Harmonized Acupuncture, Um, and the Management Defendants engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

528.   When GEICO paid the bills and charges submitted by or on behalf of Harmonized Acupuncture for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Harmonized Acupuncture, Um, and the Management Defendants' improper, unlawful, and/or unjust acts.

529.   Harmonized Acupuncture, Um, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

530.   Harmonized Acupuncture, Um, and the Management Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

531.   By reason of the above, Harmonized Acupuncture, Um, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $71,000.00.

## EIGHTEENTH CAUSE OF ACTION
### Against Sa Qi Acupuncture, Kuroyama, and the Management Defendants
### (Common Law Fraud)

532.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

533. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

534. Sa Qi Acupuncture, Kuroyama, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

535. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Sa Qi Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and/or actually owned and controlled by non-medical professionals; (ii) in every claim, the representation that Sa Qi Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR  § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting and kickback arrangements with non-medical professionals; and (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich Defendants.

536. Sa Qi Acupuncture, Kuroyama, and the Management Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Sa Qi Acupuncture that were not compensable under New York no-fault insurance laws.

537.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $63,000.00 pursuant to the fraudulent bills submitted by Defendants through Sa Qi Acupuncture.

538.     Sa Qi Acupuncture, Kuroyama, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

539.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### NINETEENTH CAUSE OF ACTION
**Against Sa Qi Acupuncture, Kuroyama, and the Management Defendants**
**(Unjust Enrichment)**

540.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

541.     As set forth above, Sa Qi, Kuroyama, and the Management Defendants engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

542.     When GEICO paid the bills and charges submitted by or on behalf of Sa Qi Acupuncture for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Sa Qi Acupuncture, Kuroyama, and the Management Defendants' improper, unlawful, and/or unjust acts.

543.     Sa Qi Acupuncture, Kuroyama, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

544.    Sa Qi Acupuncture, Kuroyama, and the Management Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

545.    By reason of the above, Sa Qi Acupuncture, Kuroyama, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $63,000.00.

**TWENTIETH CAUSE OF ACTION**
**Against K N Acupuncture, Nakamura, and the Management Defendants**
**(Common Law Fraud)**

546.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

547.    K N Acupuncture, Nakamura, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

548.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that K N Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and/or actually owned and controlled by non-medical professionals; (ii) in every claim, the representation that K N Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting and kickback arrangements with non-medical professionals; and (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee

Schedule, when in fact the billed-for services were not medically necessary, and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich Defendants. The fraudulent bills and corresponding mailings submitted to GEICO are described in the chart annexed hereto as Exhibit "6".

549.    K N Acupuncture, Nakamura, and the Management Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through K N Acupuncture that were not compensable under New York no-fault insurance laws.

550.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $138,000.00 pursuant to the fraudulent bills submitted by Defendants through K N Acupuncture.

551.    K N Acupuncture, Nakamura, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

552.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### TWENTY-FIRST CAUSE OF ACTION
**Against K N Acupuncture, Nakamura, and the Management Defendants**
**(Unjust Enrichment)**

553.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

554.     As set forth above, K N Acupuncture, Nakamura, and the Management Defendants engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

555.     When GEICO paid the bills and charges submitted by or on behalf of K N Acupuncture for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on K N Acupuncture, Nakamura, and the Management Defendants' improper, unlawful, and/or unjust acts.

556.     K N Acupuncture, Nakamura, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

557.     K N Acupuncture, Nakamura, and the Management Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

558.     By reason of the above, K N Acupuncture, Nakamura, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $138,000.00.

## **JURY DEMAND**

559.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.      On the First Cause of Action against the Provider Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO;

B.      On the Second Cause of Action against Chumaceiro and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $362,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Chumaceiro and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $362,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against Chumaceiro, Smart Choice Medical, and the Management Defendants, compensatory damages in favor of GEICO  an amount to be determined at trial but in excess of $362,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against Chumaceiro, Smart Choice Medical, and the Management Defendants, more than $362,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against Quiroga and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $113,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

G.      On the Seventh Cause of Action against Quiroga and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $113,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.      On the Eighth Cause of Action against Quiroga, Southern Blvd Chiropractic, and the Management Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $113,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

I.      On the Ninth Cause of Action against Quiroga, Southern Blvd Chiropractic, and the Management Defendants, more than $113,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

J.      On the Tenth Cause of Action against Bucci and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $171.000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

K.      On the Eleventh Cause of Action against Bucci and the Management Defendants, compensatory damages in favor of Queens in an amount to be determined at trial but in excess of $171.000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

L.      On the Twelfth Cause of Action against Bucci, Brownsville Chiropractic, and the Management Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $171.000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

M.      On the Thirteenth Cause of Action against Bucci, Brownsville Chiropractic, and the Management Defendants, more than $171,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

N.      On the Fourteenth Cause of Action against Um and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $127,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

O.      On the Fifteenth Cause of Action against Um and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $127,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

P.      On the Sixteenth Cause of Action against Um, Harmonized Acupuncture, and the Management Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $127,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Q.      On the Seventeenth Cause of Action against Um, Harmonized Acupuncture, and the Management Defendants, more than $127,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

R.      On the Eighteenth Cause of Action against Kuroyama, Sa Qi Acupuncture, and the Management Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $63,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

S.      On the Nineteenth Cause of Action against Kuroyama, Sa Qi Acupuncture, and the Management Defendants, more than $63,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

T.      On the Twentieth Cause of Action against Nakamura, K N Acupuncture, and the Management Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $138,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

U.      On the Twenty-First Cause of Action against Nakamura, K N Acupuncture, and the Management Defendants, more than $138,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper.

Date: May 15, 2020

RIVKIN RADLER LLP

By:____/s/ *Barry I. Levy*_____
            Barry I. Levy, Esq.
            Frank P. Tiscione, Esq.
            Colleen O'Neil, Esq.
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company*